KUSKIN, J.T.C.
Plaintiff appeals the 1997 and 1998 assessments on property in the Borough of Mountain Lakes designated on the Borough Tax Map as Block 7, Lot 7, and commonly known as 133 Route 46. The property was assessed for 1997 at a total of $12,936,000, and for 1998 at a total of $10,650,000. The parties have stipulated that the applicable ratios under N.J.S.A. 54:l-35a(a) (Chapter 123) were 98.39% for 1997 and 97.21% for 1998, and that the Borough tax rate was $2.27 per $100 of assessed valuation for 1997 and $2.35 per $100 of assessed valuation for 1998.
Plaintiffs appraiser determined property values of $7,600,000 as of October 1, 1996 for the 1997 tax year, and $8,300,000 as of October 1, 1997 for the 1998 tax year. Defendant’s appraiser determined property values of $13,229,000 as of October 1, 1996 and $12,437,500 as of October 1,1997.
I decided these appeals by oral opinion on December 19, 1998. This opinion refines and amplifies my oral opinion. I have, however, omitted portions of my oral opinion containing detailed analyses of comparable leases, operating expenses, and comparable sales.
I
Presumption of Correctness
Original assessments and judgments of county boards of taxation are entitled to a presumption of validity. The Supreme Court has described the presumption as follows:
The presumption attaches to the quantum of the tax assessment. Based on this presumption the appealing taxpayer has the burden of proving that the assessment is erroneous. The presumption in favor of the taxing authority can be rebutted only by cogent evidence, a proposition that has long been settled. The strength of the presumption is exemplified by the nature of the evidence that is required to overcome it. That evidence must be “definite, positive and certain in quality and quantity to overcome the presumption.”
*374 It is clear that the presumption is not simply an evidentiary presumption serving only as a mechanism to allocate the burden of proof. It is, rather, a construct that expresses the view that in tax matters, it is to be presumed that governmental authority has been exercised correctly and in accordance with law.
[Pantasote Co. v. City of Passaic, 100 N.J. 408, 413, 495 A.2d 1308 (1985) (citations omitted) (emphasis added).]
In Ford Motor Co. v. Edison Tp., 127 N.J. 290, 604 A.2d 580 (1992), the Supreme Court revisited the issue of the role of the presumption of validity. The Court’s discussion, particularly its adoption of language from Samuel Hird & Sons, Inc. v. Garfield, 87 N.J.Super. 65, 75, 208 A.2d 153 (App.Div.1965), stating that the presumption “has no ... probative force once substantial evidence to the contrary has. been adduced,” suggests that the presumption is far less significant that the “construct” described in Pantasote. Thé Ford Motor Co. opinion quotes the following from Pennwalt Corp. v. Holmdel Tp., 4 N.J.Tax 51, 55 (Tax 1982) to describe the court’s responsibilities after such “substantial evidence” has been presented:
[0]nce sufficient competent evidence is produced and the presumption overcome, the matter is not therebjr concluded in favor of the complaining party. The court must then turn to a consideration of the evidence adduced on behalf of both parlies and conclude the matter based on a fair preponderance of the evidence.
[Ford Motor Co., supra, at 312, 604 A.2d 580.]
The Supreme Court then concludes as follows:
[AJlthough there may have been enough evidence to overcome the presumption of correctness at the close of plaintiffs c'ase-in-chief, the burden of proof remained on the taxpayer throughout the entire case, and in the face of defendant’s proofs, to demonstrate that the judgment under review was incorrect. See Pantasote Co. v. City of Passaic, supra, 100 N.J. at 413, 495 A.2d 1308.
[Id. at 314-15, 604 A.2d 580.]
Neither the Supreme Court nor the Appellate Division has defined the quality or quantity of evidence necessary to satisfy the “cogent evidence” requirement of Pantasote or the “substantial evidence” requirement of Ford Motor Co. In Riverview Gardens Section One, Inc. v. North Arlington Bor., 9 N.J. 167, 87 A.2d 425 (1952), the Supreme Court stated that the presumption is overcome where the plaintiff presents “sufficient competent evidence to determine the true valuation of the property.” Id. at 175, 87 *375 A.2d 425. The Tax Court’s decision in Rumson Bor. v. Peckham, 7 N.J.Tax 539 (Tax 1985), indicates that such evidence must simply establish that reasonable people might differ as to the correctness of the assessment or, stated differently, the evidence must raise a debatable question as to the correctness of the assessment. Id. at 547-48 nn. 1-2, 550.
The New York Court of Appeals discussed the applicable evidence standard in FMC Corp. v. Unmack, 92 N.Y.2d 179, 677 N.Y.S.2d 269, 699 N.E.2d 893 (1998). The Court noted that, under New York law, a tax assessment is presumptively valid and that, “when a petitioner challenging the assessment comes forward with ‘substantial evidence’ to the contrary, the presumption disappears.” Id. at 896. The Court defined “substantial evidence” as follows:
The substantial evidence standard is a minimal standard. It requires less than “dear and convincing evidence” and less than proof by “it preponderance of the evidence, overwhelming evidence or evidence beyond a reasonable doubt.”
In the context of tax assessment cases, the substantial evidence standard merely requires that petitioner demonstrate the existence of a valid and credible dispute regarding valuation. The ultimate strength, credibility or persuasiveness of petitioner’s arguments are not germane during this threshold inquiry. Similarly, the weight to be given to either party’s evidence is not a relevant consideration at this juncture. Instead, in answering the question whether substantial evidence exists, a court should simply determine whether the documentary and testimonial evidence proffered by petitioner is based on “sound theory and objective data” rather than on mere wishful thinking. Though the substantial evidence standard is low, it “does not rise from bare surmise, conjeclure, speculation or rumor."
In the absence of substantial evidence to the contrary, the tax assessment should be upheld as presumptively valid. On the other hand, once petitioner has met its initial burden and rebutted the presumption of validity that attaches to the assessment, a court must weigh the entire record, including evidence of claimed deficiencies in the assessment, to determine whether petitioner has established by a preponderance of the evidence that its property has been overvalued.
[Id. at 896-97 (citations omitted).]
Based on the foregoing discussion, I conclude that the presumption of validity which attaches to a tax assessment functions as follows in the context of an assessment appeal:
*376 1) The plaintiff[1] must first overcome the presumption by presenting evidence sufficient to demonstrate the value of the subject property, thereby raising a debatable question as to the validity of the assessment. Under the phrasing of the New York Court of Appeals, the plaintiff must present evidence sufficient to demonstrate that the appeal is “based on ‘sound theory and objective data’ rather than on mere wishful thinking.”
2) If the defendant moves to dismiss at the close of the plaintiffs proofs, pursuant R. 4:37-2(b), the court, in deciding whether the plaintiffs evidence satisfies the standard set forth in Item (1), must accept such evidence as true and accord the plaintiff all legitimate inferences which can be deduced from the evidence. Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 535, 666 A.2d 146 (1995).
3) If the court determines that the plaintiff has failed to overcome the presumption, then judgment should be entered dismissing the appeal thus affirming the assessment, unless the defendant has asserted a counterclaim in which event the trial continues with respect to the counterclaim. A defendant which has not asserted a counterclaim, but which seeks an assessment adjustment under N.J.S.A. 54:51A-6(a), is not entitled to present valuation proofs if its R. 4:37-2(b) motion to dismiss is granted.
4) If the court denies the R. 4:37-2(b) motion, then, at the conclusion of the trial, the court should proceed directly to weigh and evaluate all the evidence, and determine whether the *377 plaintiff has demonstrated, by a preponderance of the evidence, that the assessment should be adjusted. The court need not reconsider the presumption. This procedure applies even if the defendant has asserted a counterclaim or, without a counterclaim, seeks an adjustment in the assessment pursuant to N.J.S.A. 54:51A-6(a). Once the court determines, in ruling on the R. 4:37-2(b) motion, that the presumption has been overcome, the court is obligated to. weigh and evaluate the evidence and decide the appeal on the merits whether or not the plaintiffs proofs, in themselves, are sufficient to overcome the presumption. See Samuel Hird & Sons, Inc. v. Garfield, supra, 87 N.J.Super. at 75, 208 A.2d 153 (stating that once the presumption of validity is met, the trial court (there the Division of Tax Appeals) must “appraise the testimony, [and] make a determination of true value.”)
5) In the absence of a R. 4:37-2(b) motion which is denied, the presumption of validity remains in the case through the close of all proofs. See Rodwood Gardens, Inc. v. City of Summit, 188 N.J.Super. 34, 455 A.2d 1136 (App.Div.1982), which states, in the context of an appeal from a judgment rendered at the conclusion of a full trial, that “only when the presumption is overcome does it become incumbent upon the Tax Court to appraise the testimony, make a determination of true value, and fix the assessment.” Id. at 38, 455 A.2d 1136. See also Cigolini v. Fairview Bor., 208 N.J.Super. 654, 663-64, 506 A.2d 811 (App.Div.1986). Consequently, if the defendant does not move to dismiss at the conclusion of the plaintiffs proofs pursuant to R. 4:37-2(b), then, at the conclusion of the trial, the court, before proceeding to decide the appeal based on weighing and analysis of the evidence, must first determine whether the presumption of validity has been overcome. In making this determination, the court should view the evidence as if a motion for judgment at the close of all the evidence had been made pursuant to R. 4:40-1 (whether or not the defendant or plaintiff actually so moves), employing the evidentiary standard applicable to such a motion.
In the case of motions for involuntary dismissal, the test is, as set forth in R. 4:37-2(b) and equally applicable to motions for judgment [under R. 4:40-1], whether “the evidence, together with the legitimate inferences therefrom, could sustain a judgment in favor” of the party opposing the motion, t.e., if, accepting as true all *378 the evidence which supports the position of the party defending against the motion and according him the benefit of all inferences which can reasonably and legitimately be deduced therefrom, reasonable minds could differ, the motion must be denied. The point is that the judicial function here is quite a mechanical one. The trial court is not concerned with the worth, nature or extent (beyond a scintilla) of the evidence, but only with its existence, viewed most favorably to the party opposing the motion.
[Dolson v. Anastasia, 55 N.J. 2, 5-6, 258 A.2d 706 (1969) (citations omitted).]
See also, Brill v. Guardian Life Ins. Co. of Am., supra, 142 N.J. at 535-36, 666 A.2d 146, and Pressler Current N.J. Court Rules, comment on R. 4:40-1 and R. 4:40-2 (1998).[2] The court should take into consideration all evidence which supports the position of the party having the burden of overcoming the presumption. See Caterinicchio v. Pittsburgh Corning Corp., 127 N.J. 428, 605 A.2d 1092 (1992) (holding that, in deciding a motion under R. 4:40-1, “the trial court must evaluate all the evidence in the light most favorable to the non-moving party.” Id. at 437, 605 A.2d 1092). The court should proceed as follows:
a) The court should first determine whether the plaintiff has overcome the presumption. If the court determines that the plaintiff has done so, then the court should proceed to weigh and evaluate the evidence and decide the appeal on the merits, whether or not the defendant has asserted a counterclaim or presented proofs which could warrant relief under N.J.S.A. 54:51A-6(a). As set forth in Item (4) above, the court need not make a separate determination as to whether the defendant has overcome the presumption with respect to a counterclaim or claim for relief under N.J.S.A. 54:51A-6(a).
b) If the court determines that the plaintiff has failed to overcome the presumption, and the defendant has not asserted a counterclaim or presented evidence which, on its face,[3] could *379 warrant relief under N.J.S.A. 54:51A-6(a), then the court should enter judgment affirming the assessment.
c) If the court determines that the plaintiff has failed to overcome the presumption, and the defendant has asserted a counterclaim or presented evidence which, on its face, could warrant relief under N.J.S.A. 54:51A-6(a), then the court should determine whether the defendant has overcome the presumption. If the court determines that the defendant has failed to do so, then, the court should enter judgment affirming the assessment. If, however, the court determines that the defendant has overcome the presumption, the court should proceed to weigh and evaluate all the evidence and decide the appeal on the merits.
6) Even after having determined that the plaintiff or defendant has overcome the presumption, the court may conclude that no adjustment to the assessment is warranted, in which event judgment should be entered affirming the assessment. See New Jersey Foreign Trade Zone Venture v. Mount, Olive Tp., 242 N.J.Super. 170, 576 A.2d 303 (App.Div.1990) (stating that: “Where neither party carries the burden of proof of establishing the value, the original assessment should stand.” Id. at 175, 576 A.2d 803 (citation omitted)). See also Rumson Bor. v. Peckham, supra, 7 N.J.Tax at 550. Such a denial of relief is not inconsistent with a determination that the presumption of validity has been overcome. Evidence which is sufficient for a party to overcome the presumption when considered using the artificial standard, or “rose-colored glasses,” required under R. 4:37-2(b) or R. 4:40-1, is not necessarily sufficient to carry that party’s burden of proof when all the evidence is subjected to critical analysis and weighing by the court. See Ford Motor Co. v. Edison Tp., supra, 127 N.J. at 314-15, 604 A.2d 580.
*380 In summary, whether the presumption of validity has been overcome should be determined only once, either at the close of the plaintiffs proofs in the context of a R. 4:37-2(b)(2) motion, or at the conclusion of the trial. After having determined that the presumption has been overcome, the court’s responsibility is to weigh and evaluate all the evidence and decide the appeal on the merits.
In the present ease, the defendant did not move to dismiss at the end of plaintiffs proofs. Defendant asserted a counterclaim for tax year 1997 but not for tax year 1998. Defendant did not present evidence which, on its face, could warrant relief for 1998 under N.J.S.A. 54:51A-6(a). Both parties presented the valuation testimony of well-qualified credible experts, as well as other significant evidence. I find that the entire record, when viewed under the evidentiary standard discussed above, contains adequate evidence to enable plaintiff to overcome the presumption of validity which attached to the assessments under appeal. Accordingly, I now must weigh and evaluate all the evidence and determine whether either party has established, by a preponderance of the evidence, that the true value of the subject property as of the applicable assessment dates was such as to warrant adjustments in the assessments.
II
Factual Background
The land included in the property under appeal contains 16.0523 acres. The property is bounded on the south by the westbound lanes of Route 46, and is located between the intersection of Route 46 with Rainbow Trail (on the west) and Boulevard (on the east). The site is irregular in shape, but is generally level with an upward slope at the rear and westerly property lines. This topography does not affect the utility of the site as currently improved, but does prevent any portion of the site from constituting excess land, that is, land suitable for expansion of the existing improvement or independent development.
*381 The property has approximately 655 feet of frontage on Route 46 where the main entrance is located. This entrance consists of a tree-lined driveway approximately 350 feet in length. A secondary entrance is located on Boulevard, where the property has approximately fifty feet of frontage. Parking areas are located next to the main entrance driveway and the property contains a pond which functions as a retention or detention basin. The property is located in the OL-1 Zone, where the principal permitted uses are: business, professional or service offices; bank and financial institutions; light manufacturing; data processing; and storage, assembly and fabrication of goods and materials.
The property is improved with a two-story building. The parties have stipulated that the gross rentable area of the building, including usable rental space and common areas, is 115,678 square feet, allocated 97,678 square feet to office use and 18,000 square feet to warehouse use. The building was in generally good condition as of the applicable valuation dates, although caulking between some exterior panels needed repair and the concrete steps at the main entrance showed some deterioration. Under the zoning ordinance, 489 parking spaces were required for the stipulated office area, assuming the entire area is used as office space. Only 316 spaces were available.
The interior of the building has several discrete areas. The 18,000 square foot warehouse section is located to the rear. To the west of the warehouse on the first floor is a cafeteria containing approximately 5500 square feet of gross rentable area. The cafeteria contains no walk-in refrigeration or grill facilities. To the east of the warehouse on the first floor is an assembly/production area containing approximately 8000 square feet of gross rentable area, and to the east of the assembly/production area is a data center containing approximately 17,000 square feet of gross rentable area. Both of these areas are improved with dropped ceilings, heating, ventilating and air-conditioning, tile floors, and recessed lighting fixtures, but no windows. Both areas are superi- or in quality to the warehouse space, but, because of the absence of windows, they are not equivalent to other office space in the *382 building. In the easterly portion of the second floor, above the data center and the majority of the assembly/production area, is office space containing approximately 29,000 square feet of gross rentable area. The southerly portion of the building, which faces Route 46, contains office space on both the first and second floors consisting of approximately 38,000 square feet of gross rentable area.
The main entrance to the building is located at its southeastern end, and leads to a lobby area. Atriums, which are twelve feet wide and two stories high, lead from the lobby through the east and. south wings of the building. A circular stairway runs from the lobby to the second floor, and the one elevator in the building is located adjacent to the lobby. The building was constructed by Newsweek, Inc. in 1987 for use as offices and for distribution operations, which explains the diversity of space described in the preceding paragraph.
The portion of Route 46 in the vicinity of the entrance to the subject property contains a variety of small commercial uses, including restaurants, a travel agency, gasoline -service stations, a bagel shop,, liquor store, lumber store, travel agency, catering facility, professional office building and animal hospital. A bank branch is located at the northwest corner of Route 46 and Boulevard. A lower quality office building is also located on Boulevard, next to a tennis club. A residential development is located along Rainbow Trail, to the west of the property, and a paddle tennis facility is located to the rear of the property. The property is approximately two miles from Route 80. The building is the only office building of 60,000 square feet or more along Route 46 between Parsippany-Troy Hills and the Rockaway Mall in Rockaway Township.
Plaintiff acquired the subject property from Newsweek, Inc. on May 27, 1997 for $7,250,000, Because plaintiff contends that its purchase demonstrates the property’s valúe for tax assessment purposes, the background of such purchase is relevant.
In 1994 or 1995, Newsweek made a corporate decision to outsource the distribution work being performed at the property. In *383 January 1996, Newsweek advised Thomas Grenier, a real estate broker with Edward S. Gordon, Co. (“ESG”), of this decision. Mr. Grenier advised Newsweek that sale of the property would take one to two years. On January 25, 1996 he sent a letter to Newsweek containing an opinion that the value of the property was $5,500,000 to $6,000,000. Newsweek did not sign a brokerage agreement with ESG until June 1996. During the period January 1996 through June 1996, however, Mr. Grenier contacted parties he considered to be logical purchasers. Although Mr. Grenier regarded the building as a “single user play,” meaning that its most likely purchaser would be an entity which would occupy the entire facility, the first prospective purchasers he contacted were real estate investors, namely Gale & Wentworth (“G & W”), SJP Properties, Mack and Cali. Other brokers and salespeople at ESG were aware of the availability of the property.
On April 12, 1996, G & W offered to purchase the property for $7,025,000, payable in cash, subject to a ninety day due diligence period. A letter dated June 3, 1996 from ESG to G & W stated that Newsweek was interested in beginning discussions based upon the offer, that the offer was being reviewed, and that alternative disposition options were being considered. On July 18, 1996, ESG wrote to G & W indicating an asking price of $8,375,-000. Before setting this price, Newsweek had received an appraisal, from the. firm which prepared the appraisal on behalf of plaintiff in these appeals, showing values of $6,500,000 to an owner/user and $3,900,000 to an investor.
On June 29, 1996, Newsweek formally retained ESG as broker to sell the subject property, and to find alternative office space for Newsweek which intended to vacate the property at closing. The brokerage agreement expired September 30, 1997. On July 29, 1996, ESG submitted a marketing plan to Newsweek which proposed direct marketing to prospects and marketing to the brokerage community. The initial targets were to be the education and medical industries. The direct marketing effort would consist of flyers, color brochures, as well as telephone contacts. The marketing budget approved by Newsweek was $8,333, of which $2,056 *384 represented the mailing cost for a flyer and information booklet, and $6,277 represented the cost of preparation of brochures. Although ESG did not make its initial mailing, pursuant to the marketing plan, until October 1996, ESG received inquiries from brokers in September 1996, while negotiations continued between G & W and Newsweek.
On September 6, 1996 ESG wrote to G & W setting forth Newsweek’s offer to sell for $7,750,000. In November 1996, ESG received an offer from another party to purchase for $5,000,000 to $6,000,000. On November 25,1996, ESG wrote to G & W confirming a sale for $7,250,000. On December 11, 1996, plaintiff herein, MSGW Real Estate Fund, LLC (“MSGW”), an entity consisting of G & W and Morgan Stanley, submitted a written offer to purchase for $7,250,000. On January 13, 1997, JVC Corporation, through an ESG broker other than Mr. Grenier, offered to purchase the property for $7,350,000, which price included $350,000 for the furniture and fixtures in the building. The offer was subject to a sixty day due diligence period. Newsweek’s response to the offer was “too little, too late”.
MSGW and Newsweek signed a contract of sale on February 14, 1997 at a sales price of $7,250,000. The contract contained provisions permitted Newsweek to remain in portions of the first and second floor offices for up to ninety days after closing. These provisions resulted from Newsweek’s concerns about its ability to vacate the building at closing because of difficulties ESG encountered in finding replacement office space. Between March and May 1997, Newsweek discussed with MSGW leasing back a portion of the subject property. MSGW was opposed to leasing a portion of the property because G & W desired to have the entire building vacant and available for a single tenant. Between the contract and closing dates, Gale & Wentworth Real Estate Advisors, on behalf of MSGW, marketed the building for single tenant occupancy.
The sale from Newsweek to MSGW closed on May 27, 1997. On the same date MSGW entered into a lease with Newsweek for 28, 967 rentable square feet of office space on the second floor of *385 the subject building. This was the prime office space in the building. MSGW decided that having a “bird in the hand” was preferable to a totally vacant building available for a single tenant. The Newsweek lease provided for an annual rent of $21.75 per square foot for the initial five years of the ten year term, and $23.75 per square foot for the second five years. The rent was on a modified gross basis, with the landlord responsible for base year expenses, including real estate taxes, and the tenant responsible for increases in those expenses. The lease granted Newsweek two five-year renewal options at rents equal to 95% of fair market rent.
Plaintiffs witnesses described the purchase as a “value added play,” that is, a purchase where plaintiff anticipated increasing the value of the property by capital improi- ments, repositioning the building in the marketplace, and leasing vacant space. Mr. Grenier testified that a “value added play” is equivalent to a bargain purchase.
After closing of title, Gale & Wentworth Real Estate Advisors continued its efforts to lease space in the building. Such efforts continued through the conclusion of the trial of this matter, and included open houses, color brochures and advertising letters to brokers, and direct contacts with prospective tenants. These efforts achieved only limited success. Through the conclusion of the trial, only two leases were signed, in addition to the lease to Newsweek. One lease, dated May 8, 1998, was for 4,703 square feet of office area on the second floor. The lease had an initial term of five years, with a five year option to renew at fair market rent. The annual rent for the initial five year term was $21.50 per square foot on a modified gross basis. A brokerage commission of five percent of the rent was payable with respect to this lease.
The second lease, dated June 29, 1998, was for 24,966 square feet of first floor area including office space, the data center and a portion of the assembly/produetion area. The lease was for an initial term of ten years with a five year renewal option at fair market rent. The initial annual rent was $23 per square foot on a modified gross basis, and a brokerage commission of five percent *386 of the rent was payable. On September 2, 1998, the tenant added 488 square feet of office space at an annual rent of $23 per square foot, and 2370 square feet of assembly/production area space at annual per square foot rents of $15 for years one and two, $17 for years three to six, and $19 for years seven to ten.
Vacant as of the conclusion of the trial, therefore, were the following: 18,000 square feet of warehouse, 5500 square feet of cafeteria, 8000 square feet of assembly/production area, 7000 square feet of first floor office, and 11,500 square feet of second floor office. All of these rentable areas are approximate. The total vacancy was approximately 50,000 square feet of rentable area.
The parties have stipulated that the warehouse portion of the property, including appropriate land area, had a value of $700,000 as of each assessment date. Accordingly, the only valuation issue remaining relates to the 97,678 square feet of building area which the parties have stipulated constitutes office area, and.related land. Unless otherwise stated, the word “property” as used in the remainder of this opinion refers to such office area and related land, and the word “building” refers to the office area.
Ill
Valuation
The first step in a valuation analysis is to determine the highest and best use of the property. On this issue the appraisers for the parties are essentially in agreement. Both testified that, as of October 1,1996, the highest and best use of the property was for a single occupant, and that, as of October 1, 1997, the highest and best use of the property was for multiple tenant occupancy. I accept the appraisers’ determination of highest and best use.
Both appraisers used the income approach to value the property. Plaintiffs appraiser also used the market data or comparable sales approach. Defendant’s appraiser considered sales of other office buildings, but only as support for his opinion that the sale of the subject property did not reflect the fan* market value of the *387 property for tax assessment purposes. The parties have stipulated that each appraiser considered the cost approach, and that neither appraiser relied on that approach.
A. Income Approach.
I will discuss first the income approach to value, the initial step of which is to determine fair market rent (also referred to as economic rent) for the property as of each valuation date. Plaintiffs appraiser determined such rent by considering different comparable leases for each valuation date, with some overlap. Defendant’s appraiser used the same comparable leases for both dates.
For the October 1, 1996 valuation date, plaintiffs appraiser used six comparables, three of which were leases for entire buildings, of which two were on a net rent basis, with the tenant responsible for all operating expenses, including real estate taxes. The other of these three entire building leases was on a modified gross rent basis, with the landlord responsible for the base year operating expenses, including property taxes, and the tenant responsible for increases in those expenses. Of the other three lease comparables, one was a net lease for a portion of a building, and two were leases of portions of buildings on a modified gross rent basis. Plaintiff’s appraiser valued the property as of October 1, 1996 on a net rent basis. He adjusted his three comparable leases having modified gross rents by subtracting an estimated expense amount, including taxes. Based on his analysis of all six comparables, the appraiser determined an annual economic net rent, as of October 1, 1996, of $12.25 per square foot, assuming a $15 per square foot tenant improvement allowance (discussed below). He adjusted this rent to $11.75 per square foot based on his conclusion that the subject building had an add-on factor of 23%, which exceeded the market standard add-on factor of 15% to 18%. The add-on factor represents the difference between useable space and gross rentable area, wdiich difference is attributable to common areas. Rents are generally calculated using gross rentable area.
*388 Defendant’s appraiser used six lease comparables, only one of which was for an entire building. This lease was on a net rent basis. His other leases were for portions of buildings, with rent payable on a modified gross basis. In valuing the property as of October 1, 1996 for single tenant occupancy, the appraiser determined that annual economic rent was $21 per square foot on a modified gross basis. He gave no consideration to a tenant improvement allowance. Assuming, as did defendant’s appraiser, that the operating expenses constituting the difference between net rent and modified gross rent are $7 per square foot, the appraiser’s rent of $21 per square foot translates into net rent of $14 per square foot per year.
I conclude that the leases for entire buildings used by the appraisers support the conclusion of plaintiffs appraiser that, for a highest and best use of single tenant occupancy, the income approach should be applied using net rent. I further conclude that the comparable leases containing net rents are more reliable indicators of rental value than modified gross rent leases with adjustments for expenses. Using net leases eliminates the uncertainty inherent in the amount of operating expenses to be deducted to translate a modified gross rent into a net rent. I have, however, given some consideration to the modified gross leases as adjusted by the appraisers.
The net rent leases considered by plaintiffs appraiser indicated annual per square foot rents in effect as of October 1,1996, before adjustment, of $12.40, $10.75 and $11.75 (the lease for a portion of a building). After adjustment by the appraiser, the rents were $12.71, $12.57, and $11.75, respectively. The net rent lease used by defendant’s appraiser reflected an annual rent of $16.75 per square foot. Applying the adjustments used by the appraiser, but omitting his $7 per square foot positive adjustment to translate net rent into modified gross rent, produces an adjusted annual net rent of $14.32 per square foot.
The modified gross rent leases used by plaintiffs appraiser, after his deduction of operating expenses (including taxes), in order to translate the rents into net rents, and after other *389 adjustments, reflected annual per square foot net rents of $10.81, $12.20 and $10.29. If I adjust the modified gross rents used by-defendant’s appraiser to net rents by subtracting $7 in expenses (the same amount which, as discussed above, the appraiser used to “gross up” a net lease), and then make the same percentage adjustments which he made to his lease comparables, the comparables reflect annual per square foot net rents of $17.24, $14.40, $16.02, $14.21 and $13.35.
The parties presented extensive testimony concerning whether the subject building is Class B, Class A or Class AA quality, and contended that, in determining the economic rent for the subject building based upon comparable leases in other buildings, the quality level of the subject building must be compared to the quality level of those other buildings. Class A and Class B buildings are defined as follows:
Class A space is characterized by superior location and access; high-quality construction materials and condition; and professional management. Class A buildings are competitive with new buildings and attract high-quality tenants. Class B buildings have good location, management, and construction, but may suffer some physical deterioration or functional obsolescence. Tenant standards are high, but rents are below those charged for space in new or class A buildings.
[Appraisal Institute, The Dictionary of Real Estate Appraisal, 58-59 (3rd ed.1993).J
Plaintiff claimed the subject building was Class B quality, notwithstanding having described the building as Class A in lease marketing materials. Defendant’s appraiser testified that the building was Class A to Class AA (major corporation headquarters) quality.
The comparable leases used by defendant’s appraiser (with the exception of the lease in the subject building to Newsweek) were located in very high quality office buildings in prestigious high quality office parks. These buildings have windows throughout, and are of Class A to Class AA quality which is superior to the subject building. The comparable leases used by plaintiffs appraiser, as of both October 1, 1996 and October 1, 1997, were located in buildings closer in quality level to the subject building. As described above, the subject building is not a pure office building. It contains a warehouse area and windowless assembly/production and data center areas. This windowless con *390 dition is curable, but not without a substantial cost. The building is not located in an office campus setting. Although the uses of properties on Route 46 do not have a material effect on rents achievable in the subject property, the location of the property is inferior to an office park location. Based on the foregoing discussion, I conclude that the quality level of the subject building is between Class B and Class A. Consequently, I will attribute lesser weight to the lease comparables used by defendant’s appraiser for both valuation dates, and will attribute greater weight to the comparables used by plaintiffs appraiser.
As stated above, in determining economic net rent as of October 1, 1996, I rely most heavily on the net leases used by both appraisers which, as adjusted, indicate annual per square foot net rents of $12.71, $12.57, $11.75 (for less than an entire building) and $16.75. After giving some consideration to the modified gross leases used by the appraisers, I conclude that the economic net rent for the office portion of the subject building, as of October 1, 1996, was $13 per square foot per year. I reject the adjustment made by plaintiffs appraiser for an excess add-on factor because plaintiff did nof; establish such factor by a preponderance of the evidence for either of the years under appeal. Plaintiff presented only conclusory testimony as to the factor, did not specifically identify the common areas constituting the add-on space, and did not provide any specific measurements of those areas. The leases for the subject building provide no basis for determining the add-on factor reflected in rentable areas. A memorandum prepared by Newsweek indicated a common area factor for the building of 16.9%, as did two documents prepared by ESG based on information from Newsweek. In a previous appraisal of a property, the appraisers for plaintiff used “approximately 17%” as the add-on factor. In his appraisal for this appeal, plaintiffs appraiser states that the building “is reported” to have an add-on factor of 23%, thus indicating no direct knowledge by the appraiser as to the details of this factor.
The next item to be considered in an income approach to valuation is the vacancy and collection loss allowance. For his *391 October 1, 1996 valuation, plaintiff's appraiser selected 15% on the basis that, over a long term, the subject building, if used for single tenant occupancy, will be empty an average of approximately 15% of the time. Defendant’s appraiser used a 3% allowance, based on his opinion that the office market was strong as of October 1,1996, particularly for a large block of space suitable for single-tenant occupancy, where such space was in limited supply. In determining the vacancy and collection loss allowance, I take into account, in addition to the testimony of the appraisers, the general vacancy trends in Morris County and the limited amount of new office construction, both which are discussed in the appraisal reports. I also consider the opinion by plaintiffs appraiser set forth in his appraisal report that: “All factors bode well for the county’s office market over the short term. Long term prospects are also positive barring another over building cycle.”
Considering the foregoing, particularly the size of the subject building and its inclusion of area which is not purely office space, but taking into account that single-tenant leases for entire buildings are generally long-term, I conclude that the appropriate vacancy and collection loss allowance, as of October 1, 1996, is 10%.
The two remaining components of the income approach are expenses and the capitalization rate. The parties have stipulated that the basic capitalization rate to be used to value the property as of October 1, 1996 is 9.57%. This rate does not include any factor for real estate taxes. Such factor is unnecessary in a net rent analysis. Humble Oil & Refining Co. v. Englewood Cliffs Bor., 71 N.J. 401, 403-405, 365 A.2d 929 (1976) (Conford P.J.A.D temporarily assigned concurring).
The appraisers’ respective annual expense analyses did not differ significantly. Plaintiffs appraiser determined the following expenses: 8.5% of effective gross income (gross potential income minus a vacancy and collection loss allowance) for management, 5% of effective gross income for brokerage commissions, $.23 per square foot (which is equivalent to 2.3% of effective gross income *392 as determined by plaintiffs appraiser) for reserves, and a tenant improvement allowance of $1.50 per square foot. The expenses determined by defendant’s appraiser which are applicable to a net rent analysis are the following: 3% of effective gross meóme for management, 3% of effective gross income for brokerage commissions, and 2% of effective gross income for reserves.
For a highest and best use of single-tenant occupancy, I conclude that the appropriate annual expense deductions are the following: 3% of effective gross income for management, because management responsibilities are limited in scope when property is occupied by a single tenant; 5% of effective gross income for brokerage commissions, because I am satisfied that 5% is a standard commission rate and that a broker is essential to effect a lease of the property; and $.23 per square foot for reserves, because reserves are an appropriate deduction, River Office Equities v. Middletown Tp., 11 N.J.Tax 404, 411-12 (Tax 1990), and the amount is reasonable.
I will also deduct a tenant improvement allowance expense of $1.50 per square foot.
In certain real estate markets space is rented to a new tenant only after substantial interior improvements are made. If this work is performed at the landlord’s expense and is required to achieve market rent, the expense of these improvements should be included in the reconstructed operating statement as part of the replacement allowance.
[Appraisal Institute, The Appraisal of Real Estate 496 (11th ed.1996).]
The majority of the comparable net rent leases used by the appraisers reflected per square foot tenant improvement allowances ranging from $15 to $25. I am satisfied, therefore, that, in the market, landlords were required to make substantial interior improvements in order to achieve the market rent which I have determined. Accordingly, a tenant improvement allowance of $1.50 per square foot (representing $15 spread over ten years) is appropriate.
My income approach valuation conclusions as of October 1, 1996 can be summarized as follows:
*393 Gross Potential Rent (97,678 sq. ft. x $13) $1,269,814
Minus— Vacancy and Collection Loss Allowance (10%) -$ 126,981
Effective Gross Income $1,142,833
Minus Expenses—
Management (3% of EGI)— $ 34,285
Brokerage Commissions (5% of EGI)- $ 57,142
Reserves ($.23 per sq. ft.)— $ 22,466
Tenant Improvement Allowance ($1.50 per sq. ft.) $ 146,517
$ 260.410
Net Income $ 882,423
Capitalizing $882,423 at the stipulated capitalization rate of 9.57% produces a value, as of October 1, 1996, of $9,220,700 (rounded).
Plaintiffs appraiser deducted $290,000 from his October 1, 1996 income approach value for deferred maintenance. He deducted the same amount from his October 1, 1997 value, although there he entitled the deduction “capital expenditures.” As discussed below in connection with my October 1, 1997 valuation analysis, the appraiser provided inadequate information as to the components of this deduction and otherwise failed to demonstrate the appropriateness of the deduction. Based on that discussion, I reject the deduction as of both valuation dates.
For tax year 1998 both appraisers determined the highest and best use of the subject property to be for multiple tenant office use. Consistent with this determination, both appraisers, in their respective income approaches, used lease comparables from multitenant office buildings. All of the comparables contained rent provisions on a modified gross basis. Plaintiffs appraiser considered four lease comparables, which reflected unadjusted annual per square foot modified gross rents, in effect as of October 1, 1997, of $17.75, $14.96, $23.25, and $18.25. After adjustment, these rents were $21.75, $22, $20 and $20. The appraiser concluded that the economic rent for the subject property, assuming a tenant improvement allowance of $15 per square foot, and after adjusting for the excess add-on factor discussed above, was $20 per square foot per year.
*394 Defendant’s appraiser used the same six leases, and made the same adjustments to those leases, for his October 1, 1997 analysis as for his October 1, 1996 analysis. Five of those leases were for multi-tenant buildings, and one was a net rent lease for an entire building. The six leases reflected the following annual per square foot modified gross rents:' $26.16, $23, $23.95, $22.75 (the lease in the subject building to Newsweek), $23.75 (after adding $7 per square foot of expenses to a net rent of $16.75 per square foot) and $21.83. After adjustment by the appraiser, these leases reflected per square foot rents of $23.54, $20.70, $22.63, $20.53, $20.30 arid $19.65, respectively. The appraiser had determined an annual economic rent, as of October 1,1996, of $21 per square foot on a modified gross basis, and for his value as of October 1, 1997, he simply increased the rental amount by 5% to $22 per square foot.
I find that the adjustments made by the appraisers to their respective lease comparables are reasonable. I further find that the net lease used by defendant’s appraiser, which required a “grossing-up” of the rent, is the least reliable of the comparables because of concerns as to whether the appraiser’s $7 per square foot expense adjustment accurately reflects base year expenses for the building in question.
The leases considered by the appraisers, as adjusted by them, reflect the following annual rents per square foot, on a modified gross basis: $21.75, $22, $20, $20, $23.54, $20.70,- $22.63, $20.53, $20.30 (adjusted to gross) and $19.65. Taking into account the influence of the -windowless assembly/production and, data center areas of the subject building, and that the leases used by defendant’s appraiser are from buildings which are of a higher quality than the subject building, I conclude that the annual economic rent, as of October 1, 1997, is $21 per square foot, on a modified gross basis. As discussed above, I reject any adjustment to this rental amount for excess add-on space.
The next item to be determined is the vacancy and collection loss allowance. For the 1998 tax year, plaintiffs ap *395 praiser used 10%, and defendant’s appraiser used 3%. The subject building does not consist entirely of typical office space, and the evidence demonstrated that plaintiff has experienced significant difficulties in renting space in the building, notwithstanding substantial efforts not only using the expertise and contacts of Gale & Wentworth Real Estate Advisors but also enlisting outside brokers. I conclude that 10% is the appropriate vacancy and collection loss allowance for October 1,1997.
The next item in the income approach is determination of expenses. Plaintiffs appraiser determined annual operating expenses of $5.10 per square foot, including a management expense of $.50 per square foot (the equivalent of approximately 3% of the effective gross income determined by the appraiser). He made additional deductions for reserves of $.25 per square foot (the equivalent of 1.4% of the effective gross income determined by the appraiser), and brokerage commissions of 5% of effective gross income which translates into $.90 per square foot using the effective gross income determined by plaintiffs appraiser. Finally, the appraiser deducted a tenant improvements allowance of $1.50 per square foot. The appraiser’s aggregate annual expenses, exclusive of the tenant improvement allowance, equaled $6.25 per square foot, or $610,488. Defendant’s appraiser determined annual operating expenses of $3.72 per square foot. In addition, he deducted a management expense of 5% of effective gross income, brokerage commissions of 3% of effective gross income, and reserves of 2% of effective gross income. These expenses for management, commissions and reserves, when translated into dollar amounts, by using the effective gross income as determined by defendant’s appraiser, total $2.09 per square foot, producing total annual expenses of $5.81 per square foot or $567,509. Increasing the brokerage commission expense used by defendant’s appraiser to 5% of effective gross income increases his total expenses to $608,338, an amount very close to the $610,788 in expenses used by plaintiffs appraiser, excluding the tenant improvement allowance. I conclude that a 5% leasing commission expense is appropriate for the reasons set forth above in my valuation analysis of October 1,1996.
*396 I accept the expenses as determined by plaintiffs appraiser to the extent they differ from those of defendant’s appraiser. Such expenses ($5.10 per square foot, plus $.25 per square foot for reserves and 5% of effective gross income for brokerage commissions) are, in the aggregate, more reflective of the actual annual expense experience of the building than the expenses used by defendant’s appraiser. The lease data provided by the appraisers indicated that landlords of multi-tenant office buildings generally provided tenant improvement allowances, predominantly in the $15 to $20 per square foot range, with one $23 per square foot allowance. Based on this data, for the tax year 1998, in accordance with the analysis of plaintiffs appraiser, I will deduct a tenant improvement allowance expense of $1.50 per square foot ($15 per square foot spread over ten years). The total annual expenses as of October 1,1997 are, therefore, $757,005.
The parties stipulated that the basic capitalization rate as of October 1, 1997 was 9.31% and that the 1998 actual tax rate was $2.35 per $100 of assessed value, producing an effective tax rate of $2.28. The total capitalization rate, in accordance with the stipulations, is 11.59%.
The following summarizes my income approach analysis as of October 1,1997:
Gross Potential Rent — (97,678 sq. ft. x $21) $2,051,238
Minus — Vacancy and Collection Loss Allowance (10%) -$ 205,124
Effective Gross Income $1,846,114
Minus Expenses:
Operating Expenses including management ($5.10 x 97,678 sq.ft.) $498,158
$ 24,420 Reserves ($.25 x 97,678 sq. ft.)
$ 92,306 Brokerage Commissions (5% of EGI)
Tenant Improvement Allowance ($1.50 x 97,678 sq. ft.) $146,517
-$ 761,401
Net Income $1,084,713
*397 Capitalizing $1,084,713 at a capitalization rate of 11.59% produces a value, as of October 1, 1997, of $9,359,000 (rounded).
Plaintiffs appraiser made two adjustments to his October 1, 1997 income approach value. One was the subtraction of $290,000 for capital expenditures mentioned above, and the other a subtraction of $845,780 for rent loss until lease-up of the office space to a stabilized level. I reject this latter adjustment because it is inconsistent with tax appeal valuation analysis, which requires valuation of property at stabilized occupancy as of the applicable valuation date. See American Cyanamid Co. v. Wayne Tp., 17 N.J.Tax 542, 575 (Tax 1998) (rejecting a similar theory), and Pine Plaza Assocs. v. Hanover Tp., 16 N.J.Tax 194, 217-18 (Tax 1996) (rejecting a discounting of rents because space was not immediately available for rental).
The appraiser described his capital expenditures adjustment of $290,000 as including the following items: caulking — $25,000; lobby renovation — $25,000; warehouse heaters — $18,000; partial interior demolition — $71,000; and additional walkways across corridors — $18,000. These items, which are based on the owner’s capital budget (not actual expenditures), total $157,000. The appraiser offered no satisfactory explanation of the other $133,000 of his $290,000 deduction. I reject the deduction for the following reasons. The evidence does not demonstrate that the capital improvements of additional walkways and lobby renovation are essential to place the building in rentable condition, see American Cyanamid v. Wayne Tp., supra at 556, and Pine Plaza Assocs. v. Hanover Tp., supra at 217-18, or that the expenditures for such items will actually be incurred, or if incurred, will cost the budgeted amounts. Caulking or other items of deferred maintenance appear to be included either in the repairs and maintenance expense or in reserves. Interior demolition appears to be included in reserves and, in any event, the appraiser provided no description of what was to be demolished and why. Finally, I note that the appraiser defined his allowance for reserves as including “structural repairs as well as other major expenses not accounted *398 for in the other categories.” This definition indicates that all or most of the $290,000 deduction is duplicative of the expense for reserves.
B. Sales Comparison Approach.
In addition to the income approach, plaintiff s appraiser, but not defendant’s appraiser, relied on the sales, comparison approach. In valuing the subject property as of October 1, 1996, he consid-' ered five sales, including the sale of the subject property from Newsweek to plaintiff. In valuing the property as of October 1, 1997, he relied on one of the same sales, two different sales, and the sale of the subject property. In addition to testimony by its appraiser as jto the subject sale, plaintiff presented extensive testimony from other witnesses and documentary evidence (all summarized above), as to the circumstances relating to the sale. Plaintiff relies on the sale as an independent indicator of the value of the property. I will discuss the subject sale separately from my discussion of the other sales considered by plaintiffs appraiser.
The foui’ sales, other than the subject sale, used by plaintiffs appraiser for the October 1,1996 valuation date included two sales by corporate owner/users to corporate owner/users. These sales reflected unadjusted prices of $70.78 per square foot of building area and $66.19 per square foot of building area, respectively. After adjustments by the appraiser, the sales reflected $65 per square foot and $64 per square foot, respectively. The other two sales were from corporate owners to investors (as opposed to users). These sales reflected unadjusted prices of $68 and $62 per square foot of building area, respectively. As adjusted by plaintiffs appraiser, they reflected $64 and $67 per square foot, respectively. After considering these sales, and the subject sale which reflected $69 per square foot of building area, the appraiser determiried a value for the office portion of the property, as of October 1, 1996, based on the sales comparison approach, of $70 per square foot, or $6,850,000 (rounded).
*399 Sales by owner/users, whether to owner/users or to investors, must be viewed in light of the testimony by Mr. Grenier of ESG that a corporate decision to dispose of a property controls the corporation’s real estate decisions. Accordingly, an owner/user disposing of what has become an excess property is, in general, an unusually motivated seller. Plaintiffs appraiser provided no basis for me to determine that the sellers involved in his comparable sales were not so motivated. Furthermore, when a vacant building is sold to an investor, the impact on the sales price of the vacant condition of the building must be considered, as must the investor’s desire to make a “value added play.” In his October 1,1996 valuation analysis, plaintiffs appraiser made no adjustment for vacant condition to the sales prices of the properties sold to investors. I will not speculate as to the proper adjustment. Accordingly, I disregard the two sales to investors.
Because the highest and best use of the property as of October 1, 1996 could include owner/user occupancy, I will consider the two sales by owner/users to owner/users. In weighing these sales, however, I will take into account the absence of proofs that the sellers were typically motivated market sellers. As set forth above, plaintiffs appraiser, relying on these sales, the two sales I have disregarded, and the subject sale, determined a value of $70 per square foot for the subject building under the sales comparison approach, even though none of the adjusted sales prices for the four sales, other than the subject sale, exceeded $67 per square foot, and the subject sale reflected only $69 per square foot. Such a determination is consistent with The Appraisal of Real Estate, supra, which sanctions an appraiser’s reporting a value estimate outside the range indicated by the valuation approaches. Id. at 606-07. As of October 1, 1996, therefore, the sales comparison approach indicates a value range for the office portion of the subject property of $6,349,100, at $65 per square foot, to $6,850,000 at $70 per square foot, with an average of $6,600,000 (rounded).
As of October 1, 1997, plaintiffs appraiser determined a value for the office portion of the subject property under the sales *400 comparison approach of $80 per square foot, or $7,800,000 (rounded). The appraiser considered four sales, consisting of one of the investor sales included in his October 1, 1996 analysis, the sale of the subject building, and two additional sales to investors. One of these additional sales was a “flip” by MSGW which had acquired the property in bankruptcy at a very low price. MSGW made a 50% profit in a quick sale. I give this transaction very little weight.
The remaining two sales, other than the sale of the subject building, were sales to investors. Each sale building was vacant, and each was excess property to the seller. The appraiser made a positive $12 per square foot adjustment based upon the vacant status of the sale buildings as compared to “the subject’s partial tenancy .” He failed, however, to provide an adequate explanation for this adjustment, and the adjustment does not account for the tax appeal requirement that a rental building be valued at stabilized market occupancy levels. Hull Junction Holding Corp. v. Princeton Bor., 16 N.J.Tax 68, 94 (Tax 1996). The appraiser’s $12 per square foot adjustment may (or may not) have been sufficient to bring the price of each of the comparable sales to the level which would have been achieved if each building had been occupied at the same level as the subject building (approximately 30%) at the time of the sale. The appropriate market occupancy level, however, is 90%. Several witnesses, including plaintiffs appraiser, testified that a building occupied at market levels and market rents will command a higher purchase price than a vacant building. Therefore, a sale of a vacant building must be adjusted to reflect the sales price of a building at market occupancy and market rent levels. The adjustment made by plaintiffs appraiser does not indicate what the sales prices would have if the buildings had been 90% occupied.
Based on the preceding discussion, I conclude that the three comparable sales considered by plaintiffs appraiser, as part of his October 1, 1997 valuation analysis, provide only limited guidance to the court in valuing the subject property as of that date.
*401 C. Sale of the Subject Property.
Remaining for analysis is the sale of the subject property by Newsweek to MSGW. The marketing of the property and the chronology of the events leading to the sale are discussed in detail earlier in this opinion. Based on that discussion, I conclude that the property was exposed to the relevant market for an adequate period of time, and that the sale satisfies the criteria for an arms-length transaction as articulated in Hull Junction Holding Corp. v. Princeton Bor., supra at 94, with two exceptions: 1) the seller was not typically motivated, and 2) the purchase price was affected by a special factor, namely, the vacant status of the building.
Although Newsweek was not rushing to “dump” the property, nevertheless the property was an excess property. As Mr. Grenier testified with specific reference to the subject property, the corporate decision to dispose of the property drove the real estate decision. This is evidenced by: (1) Newsweek’s unwillingness to undertake the actions necessary to maximize market value, specifically, leasing-up the building, including the making of tenant improvements, before offering it for sale; and (2) Newsweek’s refusal to attempt to negotiate with JVC which, approximately two weeks before the signing of the contract between Newsweek and MSGW, offered to purchase the property for a price only approximately 3.5% below the price to MSGW, and included in such offer an additional amount for furniture and fixtures that would have brought the total price above the price negotiated with MSGW. A seller seeking to maximize the sales price at least would have responded with a counter-offer.
For the reasons discussed above, the appraiser’s positive $12 per square foot adjustment to the subject sale, to reflect the change from its vacant status as of the sale date to its 30% occupied status as of the October 1, 1997 valuation date, was inadequate to adjust the price to the amount achievable if the building were occupied at the appropriate market level on the valuation date. In his income approach, plaintiffs appraiser determined a stabilized vacancy rate of 15% as of October 1, 1996 and 10% as of October 1, 1997. As of the date of the contract of *402 sale between Newsweek and MSGW, the subject building had a 100% vacancy rate. I will not speculate as to the appropriate adjustment to the sales price for this vacant condition, either as of October 1, 1996 or October 1, 1997. The sale was to an investor, not to an owner/user. MSGW admittedly purchased the building as a “value added play,” and, as described above, Mr. Grenier equated such a “play” with a bargain purchase.
Based on the foregoing discussion, I reach the following conclusions as to the sales comparison approach and the sale of the subject building:
(1) the sale of the subject building does not reflect fair market value for tax assessment purposes, and provides little guidance as to such value;
(2) the sales comparison approach using sales by owner/uses to owners/users, subject to the caveat set forth above relating to the; sellers’ motivations, provides a meaningful indicator of the value of the subject property as of October 1,1996; and
(3) the sales comparison approach provides little guidance as to the value of the subject property for tax- assessment purposes property as of October 1,1997.
IV
Reconciliation and Conclusions.
The final step in my analysis is reconciliation of the valuation approaches. “Reconciliation is the analysis of alternative conclusions to anive at a final value estimate.” The Appraisal of Real Estate, supra at 601. The following quotation describes the process of reconciliation:
The appraisal conclusion should reflect market value and the data analyzed should support the appraiser’s final value opinion, but data alone do not pi'oduce a value estimate. By combining data analysis with professional training and experience, the appraiser is able to exercise professional judgment and form a sound value opinion____An appraiser relies more on professional experience, expertise, and judgment in reconciliation than in any other part of the valuation process. In reconciliation an appraiser considers and evaluates varying value indications to arrive at a final value estimate. The appraiser weighs the relative significance, *403 applicability, and defensibility of each value indication and relies most heavily on the approach that is most appropriate to the nature of the appraisal.
Reconciliation requires appraisal judgment and a careful, logical analysis of the procedures that lead to each value indication Appropriateness, accuracy, and quantity of evidence are the criteria with which an appraiser forms a meaningful, defensible final value estimate. These criteria are used to reconcile the indications produced by the different approaches into a final estimate of defined value.
See, also The International Association of Assessing Officers, PropeUy Appraisal and Assessment Administration, (Joseph K. Eckert ecl.1990) which states the following with respect to reconciliation:
The appraiser looks carefully at each approach and considers why the value differences exist These differences are then reconciled and a decision made as to which values and indicators should be given more weight. Sometimes one approach will produce the single best reflection of the most probable sale price of the subject — but not necessarily. Significant weight can be attached to all three approaches; a final conclusion at a point in between might then best represent market value.
[Id. at 108.]
The exercise of expertise and judgment required of the appraiser in the reconciliation portion of a valuation analysis is equally required of the court. Here, for the reasons discussed above, I conclude that both the income approach and the sales comparison approach (based on sales by owner/users to owner/users) warrant significant consideration as value indicators as of October 1, 1996. The sale of the subject property is of little assistance as a value indicator. I attribute somewhat heavier weight to the income approach than the sales comparison approach for two reasons. First, an investor was a more likely purchaser of the property than an owner/user, as evidenced by Mr. Grenier’s actions when he learned of the availability of the property. His first contacts were with potential investor purchasers, not potential users whose identity was undoubtedly known to his brokerage company. Secondly, the sales on which I rely, that is, the sales from owner/users to owner/users, may have been influenced more by corporate decisions to dispose of excess properties than by real estate decisions to maximize property value.
The income approach indicated an October 1, 1996 value for the office portion of the subject property of $9,220,700. The *404 sales comparison approach indicated a value of $6,850,000 at $70 per square foot as used by plaintiffs appraiser, and $6,600,000 based on my analysis described above. I have discussed the weaknesses of the subject sale as an indicator of value for tax assessment purposes. Such sale, however, has some credibility and should not be totally disregarded. After reconciling the income and sales comparison approaches and giving the sales of the subject property very little weight, I conclude that the value of the office portion of the property as of October 1, 1996 was $8,200,000. Adding to this the $700,000 stipulated value of the warehouse portion produces a total value of $8,900,000.
For the tax year 1998, I rely heavily on the income approach, which demonstrated a value for the office portion of the property of $9,359,000. I have described above the weaknesses in the sales comparison approach as a value indicator as of October 1, 1997. Notwithstanding its weaknesses, the approach is not wholly without credibility, and, together with the sale of the subject property, deserves some consideration in the reconciliation process. I accord little weight to the sales comparison approach, which indicated a value of $7,800,000, and little weight to the sale of the subject property. I conclude that the value of the office portion of the property' as of October 1, 1997 was $9,200,000. Adding the stipulated warehouse value of $700,000 produces a total value of $9,900,000.
For both 1997 and 1998 the ratio of the assessed value of the subject property to its fair market value exceeds the 100% upper limit of the common level range under Chapter 123. Accordingly, relief is required under N.J.S.A 54:51A-6. Applying the stipulated Chapter 123 Ratios of 98.39% for 1997 and 97.21% for 1998 to my respective value findings for those years produces an assessment of $8,756,700 for 1997, and $9,623,800 for 1998. Judgments will be entered accordingly.

 The analysis in this discussion with respect to the plaintiff is also applicable to a defendant asserting a counterclaim or seeking an adjustment in assessment pursuant to N.J.S.A. 54:51A-6(a). Under this statute, a defendant which has not asserted a counterclaim will be entitled to an assessment adjustment if its valuation proofs demonstrate that the ratio of assessed value to true value is outside the applicable common level range. Weyerhaeuser Co. v. Closter Bor., 190 N.J.Super. 528, 542, 464 A.2d 1156 (App.Div.1983). As to a counterclaim, or a claim for assessment adjustment under N.J.S.A. 54:51A-6(a), the defendant would have the initial burden of overcoming the presumption of validity and then the burden of proving, by a preponderance of the evidence, that the assessment should be adjusted.

 If the court were to weigh and evaluate the evidence to determine if the presumption has been overcome, the analysis would be identical to that required to determine if the plaintiff or defendant has demonstrated, by a preponderance of the evidence, that the assessment should be adjusted. As a result, the presumption determination would be meaningless and redundant.

 In order for the court to decide whether the defendant's evidence, on its face, could warrant relief under N.J.S.A. 54:51A-6(a), the court should simply com *379 pare the assessment with the value asserted by the defendant. If the ratio of the assessment to the asserted value is outside the common level range, then the court must determine whether the proofs in support oí such value are sufficient to overcome the presumption.