TAX COURT OF NEW JERSEY



Joshua D. Novin
Judge

Washington & Court Streets, 1st Floor
P.O. Box 910
Morristown, New Jersey 07963
Tel: (609) 815-2922, Ext. 54680
Fax: (973) 656-4305

NOT FOR PUBLICATION WITHOUT THE APPROVAL
OF THE TAX COURT COMMITTEE ON OPINIONS

September 21, 2018

Daniel J. Pollak, Esq.
Brach Eichler, LLC
101 Eisenhower Parkway
Roseland, New Jersey 07068

Robert D. Blau, Esq.
Blau & Blau
223 Mountain Avenue
Springfield Township, New Jersey 07081

    Re:    North Ave East, LLC v. Elizabeth City
           Docket Nos. 001028-2009, 002206-2010, 000307-2011

Dear Mr. Pollak and Mr. Blau:

This letter constitutes the court's opinion following trial of the local property tax appeals brought by plaintiff, North Ave East, LLC ("North Ave East"). North Ave East challenges the 2009, 2010, and 2011 tax year assessments on its improved property located in Elizabeth City ("Elizabeth").

For the reasons stated below, the court reduces the 2009 tax year assessment and affirms the 2010 and 2011 tax year assessments.

## I.    Procedural History and Findings of Fact

Pursuant to R. 1:7-4(a), the court makes the following findings of fact and conclusions of law based on the evidence and testimony adduced during trial.

As of the valuation dates, North Ave East was the owner of the real property and improvements located at 1-71 North Avenue East, Elizabeth, New Jersey (the "subject property"). The subject property is identified on Elizabeth's tax map as Block 1, Lot 1317.

The subject property comprises a 20-acre square parcel with frontage along North Avenue East, McLester Street, and Polaris Street. The subject property is located in close proximity to Port Elizabeth, Newark International Airport, the New Jersey Turnpike, U.S. Highway 1&9 and Interstate 78. The real property is improved with a 72,100 square foot truck terminal/transit warehouse, constructed in 1965, consisting of 110 dock height doors and 5,400 square feet of office space. In addition to the truck terminal/transit warehouse, the subject property contains: (i) an 11,600 square foot truck repair garage; (ii) an 8,160 square foot truck cab repair garage; and (iii) two modular offices, consisting of approximately 8,500 square feet.[1] The subject property is "100 percent paved" and has "perimeter fencing throughout" with access to and from the property being restricted by a gate with an appurtenant two-story guard house.[2]

The subject property is located in Elizabeth's M-3, Heavy Industrial Zone, with permitted uses that include auto-related services, select commercial and light manufacturing, wholesale and storage, and distribution and trucking. Thus, use of the subject property as a truck terminal/transit warehouse is a "preexisting, but conforming" use. The subject property is located in the X Flood Hazard Zone, denoting an area of minimal flooding risk.

---

[1] North Ave East's expert (as such term is hereafter defined) offered testimony that the aggregate square footage for all buildings on the site is 100,960 square feet. However, the court's calculations reveal an aggregate square footage for all buildings of 105,760 square feet (72,100 + 5,400 + 11,600 + 8,160 + 8,500 = 105,760).

[2] Testimony was elicited during trial that North Avenue East was widened and a traffic light installed at the entrance to the subject property. However, the expert (as such term is hereafter defined) was uncertain when these street improvements were completed, estimating that "it occurred somewhere between 2011 and 2015."

The subject property's truck terminal/transit warehouse is a skeletal steel "butler or pole building" characterized by internal steel trusses forming a "gable" style roof. The roof trusses are supported by steel "load-bearing wall[]" supports that form the outline of each of the 110 dock height doors. In the center of the truck terminal/transmit warehouse is a two-story windowed "control room" where a supervisor oversees the off-loading and loading of freight. The truck terminal/transit warehouse is not air conditioned, however it contains several roof mounted heaters to provide heat during winter months. Numerous forklifts are positioned on the truck terminal/transit warehouse dock floor to permit the efficient off-loading and loading of freight. According to the expert (as such term is hereinafter defined), the subject property is a "hub location for New England Motor Freight, . . . which is a national – one of our largest trucking companies, which is owned by . . . the Schevell family . . . and has been from the beginning. It's a multi-generational property."

The 5,400 square feet office area attached to the truck terminal/transit warehouse is finished with average office finishes including, painted sheetrock walls, acoustical tile ceilings, overhead fluorescent lighting, sprinklers, and is centrally heated and air conditioned.

North Ave East timely filed Complaints directly with the Tax Court challenging the 2009, 2010, and 2011 tax year assessments on the subject property. The matters were tried to conclusion over two days.

North Ave East offered testimony from a State of New Jersey Certified General Real Estate Appraiser, who was accepted by the court, without objection, as an expert in the field of property valuation (the "expert"). The expert prepared an appraisal report expressing his opinion of the true market value of the subject property as of the October 1, 2008, October 1, 2009, and October 1, 2010 valuation dates. Elizabeth elected not to offer testimony from a valuation professional.

In both his appraisal report and during his testimony, the expert explained that the subject property is contaminated and identified on the New Jersey Department of Environmental Protection's website as a "Superfund" site. Specifically, the expert's appraisal report states that:

> As per the New Jersey Department of Environmental Protection, the subject property is considered an active site with contamination . . . [t]he following contamination was documented by the NJDEP: Air - 10/1998; Hazardous Waste - 1/2000; Water - 7/2000; Right to Know - 11/2000; TCPA - 12/2001; Land Use 12/2001; DPCC - 1/2002; Solid Waste - 1/2002 and Pesticides - 4/2002; Site Remediation - 3/2003; and Radiation (limited information) - 7/2006.

In spite of the known contamination, the expert concluded that the "conditions, once in compliance would not inhibit the development of the site." According to the expert, other than the environmental contamination, nothing was disclosed by any municipal tax maps, surveys, deeds or from other available information sources that adversely affected or impacted the subject property. Thus, the expert valued the subject property "as if clean."[3]

As of each valuation date, the subject property's tax assessment, implied equalized value, and the expert's value conclusions are set forth below:

---

[3] The court finds that the expert's decision to not consider the impact of the contamination on his concluded values does not, per se, prohibit the court from attempting to discern the subject property's true value as required under Article VIII, § 1, ¶ 1 of the New Jersey Constitution and N.J.S.A. 54:4-2.25. See Inmar Assocs., Inc. v. Carlstadt, 112 N.J. 593 (1988). As expressed by our Supreme Court in Inmar, in New Jersey there is a statutory duty imposed on the seller to remediate contaminated industrial property prior to its sale. Id. at 601-02; See also N.J.S.A. 13:1K-6 to -42. Thus, the "true value" of a property remediated annually would have the same value to a willing buyer as would a contaminated property that deferred environmental remediation until just prior to the sale of the property. Id. at 601-602. Applying the holding in Inmar to the present case, the court finds that North Ave East would likely bear the statutorily imposed burden of remediating the subject property prior to its sale and thus, the effect of contamination on the land would not impact the "true value" which a hypothetical buyer would pay a hypothetical seller, neither of which are constrained to purchase or sell the property. See Petrizzo v. Edgewater Borough, 2 N.J. Tax 197, 200 (Tax 1981); Genola Ventures-Shrewsbury v. Borough of Shrewsbury, 2 N.J. Tax 541, 551 (Tax 1981).

| Valuation date | Local Property Tax Assessment | Average ratio of assessed to true value | Implied equalized value | North Ave East's expert's opinion of true value |
|---|---|---|---|---|
| 10/1/2008 | $2,000,000 | 9.72% | $20,576,132 | $12,500,000 |
| 10/1/2009 | $2,000,000 | 10.62% | $18,832,392 | $11,750,000 |
| 10/1/2010 | $2,000,000 | 11.80% | $16,949,153 | $11,000,000 |

## II.  Conclusions of Law

### A.  Truck Terminal/Transit Warehouse

A truck terminal/transit warehouse is a "loading dock facility that allows truck freight operators to redistribute loads of their truck fleets at an intermediate transfer point."  Appraisal Institute, The Dictionary of Real Estate Appraisal, 223 (5th ed. 2010).  A truck terminal/transit warehouse is distinguishable from a traditional warehouse because it generally includes lower ceiling heights, little storage area, and functions primarily, as a staging area for "over-the-road, long-haul carriers so that small loads can be efficiently assorted and trans-shipped via smaller trucks and vehicles for distribution within the local area served by the terminal."  Port of New York Authority v. Newark, 20 N.J. 386, 390 (1956).  Thus, the utility of a truck terminal/transit warehouse is generally influenced by several key factors, including location, the number of dock doors, dock width, the site size (the distance between the dock doors and the property line), staging and parking areas, dock levelers, axle scales, fuel tanks, dolly pads, repair garages, and security. The Appraisal Institute, Appraising Industrial Properties, 329 (2005).

### B.  Presumption of Validity

"Original assessments and judgments of county boards of taxation are entitled to a presumption of validity."  MSGW Real Estate Fund, LLC v. Borough of Mountain Lakes, 18 N.J. Tax 364, 373 (Tax 1998).  "Based on this presumption, the appealing taxpayer has the burden of proving that the assessment is erroneous."  Pantasote Co. v. City of Passaic, 100 N.J. 408, 413 (1985) (citing Riverview Gardens v. North Arlington Borough, 9 N.J. 167, 174 (1952)).  "The

presumption of correctness . . . stands, until sufficient competent evidence to the contrary is adduced." Little Egg Harbor Twp. v. Bonsangue, 316 N.J. Super. 271, 285-86 (App. Div. 1998). A taxpayer can only rebut the presumption by introducing "cogent evidence" of true value. See Pantasote Co., 100 N.J. at 413. That is, evidence "definite, positive and certain in quality and quantity to overcome the presumption." Aetna Life Ins. Co. v. Newark City, 10 N.J. 99, 105 (1952). Thus, at the close of plaintiff's proofs, the court must be presented with evidence that raises a "debatable question as to the validity of the assessment." MSGW Real Estate Fund, LLC, 18 N.J. Tax at 376.

In evaluating whether the evidence presented meets the "cogent evidence" standard, the court "must accept such evidence as true and accord the plaintiff all legitimate inferences which can be deduced from the evidence." Id. at 376 (citing Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520 (1995)). The evidence presented, when viewed under the Brill standard "must be 'sufficient to determine the value of the property under appeal, thereby establishing the existence of a debatable question as to the correctness of the assessment.'" West Colonial Enters, LLC v. City of East Orange, 20 N.J. Tax 576, 579 (Tax 2003) (quoting Lenal Properties, Inc. v. City of Jersey City, 18 N.J. Tax 405, 408 (Tax 1999), aff'd, 18 N.J. Tax 658 (App. Div. 2000)). "Only after the presumption is overcome with sufficient evidence. . . must the court 'appraise the testimony, make a determination of true value and fix the assessment.'" Greenblatt v. Englewood City, 26 N.J. Tax 41, 52 (Tax 2011) (quoting Rodwood Gardens, Inc. v. City of Summit, 188 N.J. Super. 34, 38-39 (App. Div. 1982)).

At the close of North Ave East's proofs, Elizabeth moved to dismiss these matters under R. 4:37-2(b), arguing that the presumption of validity had not been overcome because: (1) the expert's highest and best use analysis was fatally flawed since he did not determine a land value;

6

(2) the expert's income capitalization approach was unsupported because he attributed a value only to the dock doors, without consideration of how much land was associated with the improvements; and (3) the expert failed to adequately support his capitalization rate with market derived data. The court concluded that the presumption of validity was overcome and denied Elizabeth's motion, placing a statement of reasons on the record.

Nonetheless, concluding that the presumption of validity has been overcome does not equate to a finding by the court that a local property tax assessment is erroneous. Once the presumption has been overcome, "the court must then turn to a consideration of the evidence adduced on behalf of both parties and conclude the matter based on a fair preponderance of the evidence." Ford Motor Co. v. Edison Twp., 127 N.J. 290, 312 (1992). The court must be mindful that "although there may have been enough evidence [presented] to overcome the presumption of correctness at the close of plaintiff's case-in-chief, the burden of proof remain[s] on the taxpayer. . . to demonstrate that the judgment [or local property tax assessment] under review was incorrect." Id. at 314-15 (citing Pantasote Co., 100 N.J. at 413).

C. Highest and Best Use

In the court's pursuit to determine the true market value of the subject property, consideration must be given to that price which a hypothetical buyer would pay a hypothetical seller, neither of which are constrained to purchase or sell the property, as of October 1 of the pretax year. See Petrizzo, 2 N.J. Tax at 200; Genola Ventures-Shrewsbury, 2 N.J. Tax at 551. An indispensable element to the process of property valuation and to the determination of true market value is discerning a property's highest and best use. Ford Motor Co., 10 N.J. Tax at 161 (Tax 1988), aff'd o.b., 12 N.J. Tax 244 (App. Div. 1990), aff'd, 127 N.J. 290 (1992). See also General Motors Corp. v. City of Linden, 22 N.J. Tax 95, 107 (Tax 2005). "For local property tax

7

assessment purposes, property must be valued at its highest and best use." Entenmann's Inc. v. Totowa Borough, 18 N.J. Tax 540, 545 (Tax 2000). Thus, the highest and best use analysis is often referred to as "the first and most important step in the valuation process." Ford Motor Co., 10 N.J. Tax at 161.

The phrase highest and best use is defined as follows:

> The reasonably probable and legal use of vacant land or an improved property that is physically possible, appropriately supported, financially feasible, and that results in the highest value. . . Alternatively, the probable use of land or improved property – specific with respect to the user and timing of the use – that is adequately supported and results in the highest present value.
>
> [The Dictionary of Real Estate Appraisal, at 93.]

The highest and best use analysis comprises the "sequential consideration of the following four criteria, determining whether the use of the subject property is: 1) legally permissible; 2) physically possible; 3) financially feasible; and 4) maximally productive." Clemente v. South Hackensack Twp., 27 N.J. Tax 255, 267-69 (Tax 2013), aff'd, 28 N.J. Tax 337 (App. Div. 2015). See also County of Monmouth v. Hilton, 334 N.J. Super. 582, 588 (App. Div. 2000).

In the expert's opinion, the existing improvements "contribute significantly" to the value of the subject property and are maximally productive. Based on his review of the zoning requirements, "the highest and best use of the land was for industrial use . . . [and] the highest and best use as improved was a continuation of that use" as a truck terminal/transit warehouse.[4] The expert offered that had "some alternative highest and best use [been chosen, the environmental

---

[4] The expert offered testimony that the subject property is located within the 2005 Kapkowski Redevelopment master plan adopted by Elizabeth which seeks to "support more modern development of industrial buildings" and "improve[e] and support[] . . . industrial uses." Thus, the expert opined that continued use of the subject property as a truck terminal/transit warehouse "was consistent" with Elizabeth's master plan.

contamination] would have to be dealt with."  In considering all potential uses of the property as vacant land, the expert explained that "you can't simply, without going through the administrative processes of getting a multitude of approvals, develop this property.  That's when the environmental issue would kick in, you'd have to remediate or resolve that issue, number one."  He reasoned that "[w]hen you're flipping to a different use, or you're opining that the value is land, you then have to comply and address all the conditions that would . . . [apply] to get you to that next use."  The expert expressed that under a "vacancy scenario . . . you then have to pretend you're going to demolish, you're going to implement, you're going to remediate [the contamination], you're going to get approvals, and that's a speculative, far-fetched approach.  So . . . it is practical to assume that the improvement . . . [is] contribut[ing] significantly . . . to [the] overall property value."  In the expert's opinion, in order for an improvement to significantly contribute to the value of a property, the "value of the property with the improvements in place exceed[s] that of the land as though vacant."  Thus, the expert did not derive an independent value of the land on which the improvements are located.

Elizabeth asserts that in performing the highest and best use analysis and weighing the potential alternate uses of the subject property, the expert was required to analyze: (1) retaining the improvements; (2) modifying the improvements in such a manner such as conversion, renovation or alteration; or (3) demolishing the improvements and redeveloping the land.  However, because the expert did not analyze and evaluate the possibility of demolishing the existing improvements and redeveloping the land, his highest and best use analysis is fatally flawed.  Moreover, Elizabeth argues that if the vacant land could support a "more intense use," the expert should have, in performing his highest and best use analysis, given consideration to the

more intense use, including presumably, the estimated costs associated with remediating the contamination.

"In any highest and best use analysis all the capabilities of the property and all the uses to which it may be applied, or for which it is adapted, are to be considered and examined and that use which yields the highest value should be selected." Ford Motor Co., 10 N.J. Tax at 165; see also Inmar Assocs, Inc. v. Edison Twp., 2 N.J. Tax 59, 64 (Tax 1980). Moreover, in characterizing "a particular use as the property's highest and best use, the selected use in a value in exchange context must be a probable use for which there must be a demand in the relevant market." WCI-Westinghouse v. Edison Twp., 7 N.J. Tax 610, 616 (Tax 1985).

However, examination of the broad spectrum of potential alternate uses to which a property can be placed "cannot overlook the reality of the use for which the [property] was designed . . . and the actual condition" which the property owner has and continues to hold the property for its daily operations. Ford Motor Co., 10 N.J. Tax at 165. Here, evidence was adduced during trial demonstrating that a demand existed in the market for use of the property as a truck terminal/transit warehouse. The principles of "property valuation should have some relationship to reality," and the reality of this matter is that the land and improvements were designed to be used as a truck terminal/transit warehouse, a staging area for a truck terminal/transit warehouse, a truck repair garage and a truck cab repair garage. Here, the expert offered three proposed comparable sales of truck terminal/transit warehouses in the Union, Essex, and Hudson County market, between March 2006 and March 2010. Additionally, the expert offered three proposed comparable leases of truck terminals/transit warehouses, in the Hudson and Bergen County market, between August 2008 and November 2009. Although several of the proposed comparable sales and leases were located in different counties, and contained physical characteristics and attributes different than the subject

10

property, these differences go to the weight and credibility that the court will accord the expert's sales, leases, and adjustments, not a lack of demand in the marketplace for truck terminals/transit warehouses. See Sunshine Biscuits, Inc. v. Sayreville, 4 N.J. Tax 486, 496 (Tax 1982) (concluding that "[t]he market for a particular parcel of real estate consists of the potential purchasers, unlimited by a specific geographical location.")

When a party seeks to present evidence that a "property's highest and best use is other than its current use, it is incumbent upon [that party] . . . to establish that proposition (alternate use) by a fair preponderance of the evidence." Ford Motor Co., 10 N.J. Tax at 167. Here, Elizabeth was afforded the opportunity to present testimony demonstrating a "more intense" alternate highest and best use of the subject property, taking into consideration the value of the vacant land, the costs of demolition, the environmental remediation costs, and the costs of redevelopment. However, Elizabeth elected not to present any evidence of an alternate highest and best use for the subject property, relying instead on its cross-examination and critique of the expert's highest and best use analysis and his conclusion that the improvements significantly contributed to the value of the property.

Thus, the court concludes that based on the evidence presented the highest and best use of the subject property is its current use as a truck terminal/transit warehouse, staging area for a truck terminal/transit warehouse, truck repair garage, and truck cab repair garage.

D. Methodology

"There is no single determinative approach to the valuation of real property." 125 Monitor Street LLC v. City of Jersey City, 21 N.J. Tax 232, 237-238 (Tax 2004) (citing Samuel Hird & Sons, Inc. v. City of Garfield, 87 N.J. Super. 65, 72 (App. Div. 1965)); see also ITT Continental Baking Co. v. East Brunswick Twp., 1 N.J. Tax 244, 251 (Tax 1980). "There are three traditional

11

appraisal methods utilized to predict what a willing buyer would pay a willing seller on a given date, applicable to different types of properties: the comparable sales method, capitalization of income and cost." Brown v. Borough of Glen Rock, 19 N.J. Tax 366, 376 (App. Div. 2001), certif. denied, 168 N.J. 291 (2001) (internal citation omitted)). The "decision as to which valuation approach should predominate depends upon the facts of the particular case and the reaction to these facts by the experts." Coca-Cola Bottling Co. of New York v. Neptune Twp., 8 N.J. Tax 169, 176 (Tax 1986) (citing New Brunswick v. Tax Appeals Div., 39 N.J. 537 (1963)); see also WCI-Westinghouse, Inc., 7 N.J. Tax at 619.

Here, the expert relied on the sales comparison approach and income capitalization approach to derive an opinion of market value for the subject property.

1. Sales Comparison Approach

The sales comparison approach is predicated upon an evaluation of market transactions involving the recent sale of similar properties. This approach involves a "comparative analysis of properties" and requires the appraiser to focus on the "similarities and differences that affect value . . . which may include variations in property rights, financing, terms, market conditions and physical characteristics." Appraisal Institute, The Appraisal of Real Estate, 378 (14th ed. 2013). "When data is available, this [approach] is the most straightforward and simple way to explain and support an opinion of market value." Greenblatt, 26 N.J. Tax at 53. The framework underlying the sales comparison approach is that "an opinion of the market value of a property can be supported by studying the market's reaction to comparable and competitive properties." The Appraisal of Real Estate, at 377. Thus, the efficacy and suitability of the sales comparison approach is dependent upon the sufficiency of the data on recent market transactions and the appraiser's detailed analysis of that data.

When engaging in a sales comparison approach, similarities must exist between the subject property and the comparable properties. "Evidence of comparable sales is effective in determining value only where there is a substantial similarity between the properties." Venino v. Carlstadt Borough, 1 N.J. Tax 172, 175 (Tax 1980), aff'd o.b., 4 N.J. Tax 528 (App. Div. 1981). By definition, comparability does not require properties to be identical, "differences between a comparable property and the subject property are anticipated. They are dealt with by adjustments recognizing and explaining these differences, and then relating the two properties to each other in a meaningful way so that an estimate of the value of one can be determined from the value of the other." U.S. Life Realty Corp. v. Jackson Twp., 9 N.J. Tax 66, 72 (Tax 1987). Thus, a fundamental predicate of the comparative approach requires evidence "be based on 'sound theory and objective data,' rather than on mere wishful thinking." MSGW Real Estate Fund, 18 N.J. Tax at 376 (quoting FMC Corp. v. Unmack, 92 N.Y. 2d 179, 188 (1998)). An appraiser must establish appropriate "elements of comparison for a given appraisal through market research and support those conclusions with market evidence." The Appraisal of Real Estate, at 390. Hence, the probative value of the comparable analysis hinges upon the similarities which can be drawn and the objective market data utilized to support adjustments thereto.

In the expert's opinion, the sales comparison approach was a pragmatic method for deriving a value for the subject property because a market exists for truck terminals/transit warehouses, and adequate sales data was available from which he could discern an opinion of value. According to the expert, the sale prices of truck terminals/transit warehouses is largely defined by the number of dock height doors existing on a property, i.e., the more dock doors that are available, the more potential revenue can be generated, thus, the higher the sale prices.

13

In performing his sales comparison approach, the expert focused on three truck terminals/transit warehouses that sold between March 2006 and March 2010. The properties were located in Elizabeth, Newark, and Jersey City. The unadjusted sale prices of the three truck terminals/transit warehouses ranged from $93,145 per dock door (Jersey City), to $175,714 per dock door (Elizabeth). The expert applied adjustments to each of the sales to account for perceived differences in: time/market conditions, location, size, the presence of dedicated warehouse area, and floor area ratio.

    a.   Improved Sales

Sale 1, located at 250 North Avenue East, Elizabeth, New Jersey, sold on March 29, 2010 for the sum of $9,840,000. This improved sale is located approximately ¼ mile from the subject property. The property consists of 5.67 acres of land and a 31,000 square foot truck terminal/transit warehouse with 56 dock height loading doors. This equates to a value of approximately $175,714.29 per dock door ($9,840,000/56 dock doors), or a value of $1,735,449.70 per acre ($9,840,000/5.67 acres). The property includes a 9,000 square foot warehouse, however it does not contain an on-site truck repair facility or an on-site truck cab repair facility.

Sale 2, located at 297-337 Delancy Street, Newark, New Jersey, sold on January 31, 2007 for the sum of $8,150,000. This improved sale consists of 5.455 acres of land and a truck terminal/transit warehouse with 58 dock height loading doors. This equates to a value of approximately $140,517 per dock door ($8,150,000/58 dock doors), or a value of $1,494,042 per acre ($8,150,000/5.455 acres). This property includes a truck repair facility.[5]

---

[5] The expert did not know the size of the truck terminal/transit warehouse, how many square feet were devoted to office use, nor the size of the adjacent buildings being used as a truck repair facility.

Sale 3, located at 390 New County Road, Jersey City, New Jersey, sold on March 29, 2006 for the sum of $5,775,000. This improved sale consists of 6.820 acres of land and a truck terminal/transit warehouse consisting of approximately 27,606 square feet with 62 dock height loading doors.[6] This equates to a value of approximately $93,145.16 per dock door ($5,775,000/62 dock doors), or a value of $846,774 per acre ($5,775,000/6.820 acres). This property does not contain an on-site truck repair facility or an on-site truck cab repair facility.

b. Adjustments

The expert applied time/market condition adjustments of 5% per year to sales 1, 2, and 3 based on his opinion that the market was in a state of decline between October 1, 2008 and October 1, 2010. Accordingly, the expert employed a time/market condition adjustment of: (a) +$733,282 (sale 1), -$679,911 (sale 2), and -$725,435 (sale 3), as of the October 1, 2008 valuation date; (b) +$241,282 (sale 1), -$1,087,411 (sale 2), and -$1,014,185 (sale 3), as of the October 1, 2009 valuation date; and (c) -$250,718 (sale 1), -$1,494,911 (sale 2), and -$1,302,935 (sale 3), as of the October 1, 2010 valuation date.

Additionally, the expert applied a -10% size adjustment to sales 1, 2, and 3 to account for the fewer dock height doors than the subject property. Sale 1 contained 54 fewer dock height doors, sale 2 contained 52 fewer dock height doors, and sale 3 contained 48 fewer dock height doors.

The expert also applied a +10% floor area ratio adjustment (ratio of land area to loading dock) to sales 1, 2, and 3 (identified as "FAR" or "Land Area/Loading Dock" in the adjustment grid). The subject property contains a ratio of 7,920 square feet of land area for each loading dock.

---

[6] The expert did not know the size of the truck terminal/transit warehouse, or how many square feet, if any, were devoted to office use.

Accordingly, the expert concluded that an adjustment of +10% to improved sales 1, 2, and 3 was necessary to account for their lower ratio of land size to dock height doors, which was 4,410 square feet per dock door (sale 1), 4,089 square feet per dock door (sale 2), and 4,791 square feet per dock door (sale 3).

Finally, the expert applied a -5.80% warehouse adjustment to sale 1 to account for the presence of a 9,000 square foot warehouse on that property, and +5% location adjustment to sale 3 to account for its "inferior" location.

After applying the foregoing adjustments, the expert concluded an adjusted sale price, per dock height door, as follows: (1) $177,858 (sale 1), $128,795 (sale 2), and $85,517 (sale 3), as of the October 1, 2008 valuation date; (2) $169,582 (sale 1), $121,769 (sale 2), and $80,627 (sale 3), as of the October 1, 2009 valuation date; and (3) $161,305 (sale 1), $114,743 (sale 2), and $75,737 (sale 3), as of the October 1, 2010 valuation date.

Ultimately, the expert concluded a per dock door value of: (a) $125,000, as of the October 1, 2008 valuation date; (b) $120,000, as of the October 1, 2009 valuation date; and (c) $115,000, as of the October 1, 2010 valuation date.

c. Conclusion

The valuation of truck terminals/transit warehouses on a per-door basis is an accepted practice, however, as stated above other pertinent and relevant factors can also play a significant role in discerning the true value of a truck terminal/transit warehouse. For example, a truck terminal's "size in square feet does influence value . . . terminals with small offices and narrow docks are not worth as much as larger ones." Appraising Industrial Properties, at 339. Thus, the utility, and correspondingly the value, of a truck terminal/transit warehouse is influenced by location, the number of dock doors, dock width, the ratio of dock doors to land area, the distance

between the dock door and property line, parking area, dock levelers, axle scales, fuel tanks, dolly pads, repair garages, and security. Id. at 329.

Here, the expert acknowledged the impact and influence that site size, and more specifically, the ratio of dock doors to land size/acreage has in the utility and comparison of truck terminals/transit warehouses. In the expert's opinion, a positive adjustment was required to sales 1, 2, and 3 to account for these comparative differences. The general principle underlying this comparative component is that a standard trailer is 53 feet long, and with the tractor attached, can reach a length of 75 feet. Id. at 331. Thus, the distance between the dock door and the property line is pivotal to ensure the safe and proper operation of trailers and the free flow of traffic. Id. at 333. Similarly, ample trailer parking areas are necessary to "accommodate the truck traffic and provide access to numerous dock doors, . . ." Id. at 335.

Therefore, the court finds that the expert's comparison and adjustments for time/market conditions, ratio of dock door to land area (or FAR), and size were adequately supported in the record by credible evidence and from market derived data.[7] The expert offered credible testimony regarding the changing economic conditions that our national economy and the subject property's market were experiencing between the 3rd Quarter 2008 and the 3rd Quarter 2010. Based on his review of national and local survey publications, he opined that a -5% per year time/market condition adjustment was warranted.[8] Additionally, the expert offered credible testimony that doors per acre is a standard employed in the truck terminal industry as a measure of the site's size

---

[7] The expert referred to his adjustment for the ratio of dock door to land area as "FAR" for the October 1, 2008 and October 1, 2009 valuation dates, and as "Land Area / Loading Dock" for the October 1, 2010 valuation date.

[8] During cross-examination, the expert offered that the national and local publications he relied upon included PWC/Korpacz's National Warehouse Market reports for the 3rd Quarter 2008 to 3rd Quarter 2010.

rather than land-to-building ratio. The expert observed that the ratio of land/acreage to dock door for the subject property is 7,920 square feet of land per dock door, conversely sales 1, 2, and 3 contain respectively 4,410, 4,089, and 4,791 square feet of land per dock door.[9] Accordingly, the expert opined that a +10% adjustment was needed to account for this disparity, which the court finds reasonable. Additionally, the expert explained that "an inherent and inverse relationship between size and the price paid per unit" exists. According to the expert:

> . . . smaller truck terminals sell for a higher per door [amount] than larger ones. So to recognize the deviation, for instance, for Sale Number 1, which had 56 versus the subject, I adjusted that sale down 10 percent . . . So that reconciles what I call the quantity issue, or what's commonly referred to as the size issue today.

The court recognizes that, as a general principle, an inverse relationship does exist between square footage and unit price (the larger the square footage the lower the unit price per square foot). Here, the expert opined that a -10% adjustment was needed to account for the unit disparity between the subject property and sales 1, 2, and 3, which the court finds reasonable.

However, the court finds that the expert failed to present adequate credible evidence, supported by objective, market-driven data, in support of his location adjustment. The expert's location adjustment to improved sale 3 lacks credible objective support in the marketplace. Explaining his location adjustment, the expert expressed that:

> Sale 3 . . . is a little bit circuitous in that it's a little bit challenging to get to the Turnpike, or to [Route] 1 and 9. It . . . doesn't have the commutation patterns that the subject has, nor that of Comparable [improved sale] 1 and 2. As such, I . . . thought it was inferior and adjusted it upwards [] 5 percent.

---

[9] In his report, the expert referred to the ratio of land size/acreage to dock doors as either "FAR" or "Land Area/Loading Dock."

No further evidence or testimony was offered by the expert in support of the proposed location adjustment. Moreover, the expert's report fails not provide any evidence or market support demonstrating that a +5% location adjustment properly and accurately accounts for the "circuitous" road patterns for improved sale 3. The appraisal report similarly concludes that "Sale 3 was considered inferior based on access to major roadways and highways and thus an upward adjustment was warranted," without any evidence or data to support the adjustment amount or explanation how the adjusted percentage was derived. As stated above, the court observes that differences in location, proximity to cargo ports, and the ability to easily navigate the roadways surrounding a truck terminal effects its utility, and correspondingly its value. However, a fundamental predicate of the sales comparison approach requires the appraiser to collect market data from similarly situated sales transactions in the marketplace and to analyze that data for differences that effect value. The appraiser must then explain the different elements of comparison and how those elements impact the value of the subject. Here, the appraiser offered no empirical evidence or market studies demonstrating that a +5% adjustment accurately accounts for the differences in location and the "circuitous" road pattern surrounding sale 3.

The probative value of the comparable analysis hinges upon the similarities which can be drawn and the objective market data utilized to support those adjustments. Here, the expert failed to provide the "why and wherefore" in support of his location adjustment. The expert did not identify any studies, surveys, or any objective market data upon which his location adjustment was founded. The weight to be accorded expert testimony relative to adjustments "depends upon the facts and reasoning which form the basis of the opinion. An expert's conclusion can rise no higher than the data providing the foundation." Inmar Assocs, Inc. 2 N.J. Tax at 66 (citing City of Passaic v. Gera Mills, 55 N.J. Super. 73). Consequently, without an adequate understanding

of the factual underpinnings of the expert's location adjustment, the court is unable to conclude that it was reasonable and must reject same.

However, as stated above and as recognized by the expert, location is one of the key factors and attributes driving the value of truck terminals/transit warehouses. Thus, the court would be irresponsible in the exercise of its duties to simply ignore the location differences between the subject property and improved sale 3. Nonetheless, without being offered or presented with a credible analysis of the market data, the court is unable to properly account for the location variance which should be attributable to sale 3. Therefore, for the foregoing reasons, the court must exclude sale 3 from its consideration as credible evidence of market value under the sales comparison approach.

Taking into consideration the elements of comparison for a truck terminal/transit warehouse, i.e., the number of dock doors, location, ratio of dock door to land area, the presence of repair garages, and security, the court finds that the expert's sale 1 and sale 2 are credible and reliable competitive and comparative evidence of value for the subject property.

Accordingly, accepting the expert's adjustments for time/market condition, size, warehouse, and FAR for sales 1 and 2, the court discerns the following per dock height door adjusted values: (1) as of the October 1, 2008 valuation date, $177,858 (sale 1), and $128,795 (sale 2); (2) as of the October 1, 2009 valuation date, $169,582 (sale 1), and $121,769 (sale 2); and (3) as of the October 1, 2010 valuation date, $161,305 (sale 1), and $114,743 (sale 2).

Reconciling the foregoing adjusted values and applying greater weight to sale 1 (60%), than to sale 2 (40%), due to its close proximity to the subject property, date of sale in relation to the valuation dates, and location in Elizabeth, the court discerns a unit value, per dock height door,

20

of: (1) $158,233, as of the October 1, 2008 valuation date; (2) $150,457, as of the October 1, 2009 valuation date; and (3) $142,680, as of the October 1, 2010 valuation date.

Accordingly, employing the sales comparison approach, the court concludes that the true or market value of the subject property was as follows: (1) $17,405,630 ($158,233 per dock door x 110 dock doors), as of the October 1, 2008 valuation date; (2) $16,550,270 ($150,457 per dock door x 110 dock doors), as of the October 1, 2009 valuation date; and (3) $15,694,800 ($142,680 per dock door x 110 dock doors), as of the October 1, 2010 valuation date.

2.  Income Capitalization Approach

When a property is income producing, the income capitalization approach is the favored method for determining the estimated value of that property. Parkway Village Apartments Co. v. Cranford Twp., 8 N.J. Tax 430 (Tax 1985), aff'd, 9 N.J. Tax 199 (App. Div. 1986), rev'd on other grounds, 108 N.J. 266 (1987); Helmsley v. Borough of Fort Lee, 78 N.J. 200 (1978); Hull Junction Holding Corp. v. Borough of Princeton, 16 N.J. Tax 68 (Tax 1996). "The income capitalization approach to value consists of methods, techniques, and mathematical procedures that an appraiser uses to analyze a property's capacity to generate benefits (i.e., usually the monetary benefits of income and reversion) and convert these benefits into an indication of present value." The Appraisal of Real Estate, 439. As Judge Hopkins succinctly stated, when deriving a value for property employing the income-capitalization approach:

> the gross rental value of the property is estimated. From the estimated gross rental there is deducted a factor for possible vacancies and collection losses. This results in effective gross income. Then all the expenses involved in running the property are subtracted, resulting in net income. Net income is the money which an investor could expect to receive through an investment in the property. It is computed into a value by means of a capitalization rate which embodies consideration of capital cost, remaining economic life of the property, and the degree of risk involved.

[Lamm Associates v. West Caldwell Borough, 1 N.J. Tax 373, 377 (Tax 1980).]

Thus, determining the economic or market rent allows an appraiser to accurately forecast the stream of income to be generated by a property and to convert that future benefit into a present value. Therefore, the first and often most critical step in performing the income capitalization approach is "the determination of the economic rent, also known as the 'market rent' or 'fair rental value.'" Parkway Village Apartments Co., 108 N.J. at 270; see also New Brunswick, 39 N.J. at 544.

Here, the subject property was not income producing, but rather was characterized by the expert as a "multi-generational" owner-occupied truck terminal/transit warehouse. However, in the expert's opinion, "data was ample and available" to employ the income capitalization approach to attempt to discern the true or market value for the subject property as of the respective valuation dates.

a. Market Rent

The term market rent refers to "the most probable rent that a property should bring in a competitive and open market reflecting all conditions and restrictions of the lease agreement, including permitted uses, use restrictions, expense obligations, term, concessions, renewal and purchase options and tenant improvements." The Dictionary of Real Estate Appraisal, at 121-22.

In determining the market rent for the subject property, the expert relied upon three leases entered into between August 2008 and November 2009. The three properties were located in Secaucus, Carlstadt, and Harrison. According to the expert, the leases were truck terminals or portions of larger buildings used as truck terminals. In the expert's opinion, the unit of comparison is principally the number of dock doors, and unit of value is the annual rent, per dock door. The unadjusted annual rent, per dock door, ranged from $5,700 (Harrison) to $9,816 (Secaucus). The

expert applied adjustments to each of the leases to account for perceived differences in: time/market conditions, location, and size.

1. Improved Leases

Improved Lease 1, located at 630 New County Road, Secaucus, New Jersey, is a multi-tenanted building, leased on August 1, 2008, for a term of 5 years, at an annual rent of $323,929. The property contains 33 dock doors which equates to an annual rent, per dock door, of $9,816.

Improved Lease 2, located at 3 Avenue A, Carlstadt, New Jersey, was leased on December 1, 2008, for a term of 5 years, at an annual rent of $215,712. The property contains 28 dock doors which equates to an annual rent, per dock door, of $7,704.

Improved Lease 3, located at 700 First Street, Harrison, New Jersey, is a multi-tenanted building, leased on November 1, 2009, for a term of 5 years, at an annual rent of $330,600. The property contains 58 dock doors which equates to an annual rent, per dock door, of $5,700.

2. Adjustments

The expert applied adjustments to each comparable lease to account for perceived differences in time/market conditions, location, and number of dock doors.[10]

As of the October 1, 2008 valuation date: (1) the annual rent for lease 1 was adjusted downward $82.02 for time/market conditions, upward 5% for location, and downward 10% for number of dock doors, resulting in an adjusted annual rental rate, per dock door, of $9,247; and (2) the annual rent for lease 2 was adjusted downward $1,059.56 for time/market conditions, upward 10% for location, and downward 10% for number of dock doors, resulting in an adjusted annual rental rate, per dock door, of $6,644; and (3) the annual rent for lease 3 was adjusted upward

_____

[10] The expert made no adjustments to the three comparable leases to account for differences in land size, building size, office area, or amenities, such as truck repair facilities.

23

309.21 for time/market conditions (the adjustment was positive because the lease was entered into 1 year after the valuation date), upward 10% for location, and downward 10% for number of dock doors, resulting in an adjusted annual rental rate, per dock door, of $6,009.

As of the October 1, 2009 valuation date: (1) the annual rent for lease 1 was adjusted downward $572.83 for time/market conditions, upward 5% for location, and downward 10% for number of dock doors, resulting in an adjusted annual rental rate, per dock door, of $8,781; and (2) the annual rent for lease 2 was adjusted downward $1,444.76 for time/market conditions, upward 10% for location, and downward 10% for number of dock doors, resulting in an adjusted annual rental rate, per dock door, of $6,259; and (3) the annual rent for lease 3 was adjusted upward $24.21 for time/market conditions, upward 10% for location, and downward 10% for number of dock doors, resulting in an adjusted annual rental rate, per dock door, of $5,724.

As of the October 1, 2010 valuation date: (1) the annual rent for lease 1 was adjusted downward $1,063.63 for time/market conditions, upward 5% for location, and downward 10% for number of dock doors, resulting in an adjusted annual rental rate, per dock door, of $8,315; and (2) the annual rent for lease 2 was adjusted downward $1,829.96 to account for time/market conditions, upward 10% for location, and downward 10% for number of dock doors, resulting in an adjusted annual rental rate, per dock door, of $5,874; and (3) the annual rent for lease 3 was adjusted downward $260.79 to account for time/market conditions, upward 10% for location, and downward 10% for number of dock doors, resulting in an adjusted annual rental rate, per dock door, of $5,439.

The expert concluded an annual rental value, per dock door, of: (a) $8,000, as of the October 1, 2008 valuation date; (b) $7,500, as of the October 1, 2009 valuation date; and (c) $7,000, as of the October 1, 2010 valuation date. After reaching his annual rental value, per dock

24

door, the expert concluded a Potential Gross Income for the subject property of: (a) $880,000, as of the October 1, 2008 valuation date ($8,000 x 110 dock doors); (b) $825,000, as of the October 1, 2009 valuation date ($7,500 x 110 dock doors); and (c) $770,000, as of the October 1, 2010 valuation date ($7,000 x 110 dock doors).

The expert then applied a vacancy and collection loss factor of 5% to the Potential Gross Income to determine an Effective Gross Income of: (a) $836,000, as of the October 1, 2008 valuation date ($880,000 - $44,000); and (b) $783,750, as of the October 1, 2009 valuation date ($825,000 - $41,250); and (c) $731,500, as of the October 1, 2010 valuation date ($770,000 - $38,500).

Next, the expert applied stabilized management fees of 2.5% and leasing commissions of 2.5% of Effective Gross Income. The expert also applied a reserve for structural expenses of $0.15 per square foot of gross building area or $15,144.[11] After deducting the management fees, leasing commissions, and structural reserves, the expert determined the subject property's Net Operating Income to be as follows: (1) $779,056 ($836,000 - $56,944), as of the October 1, 2008 valuation date; and (2) $729,462 ($783,750 - $54,288), as of the October 1, 2009 valuation date; and (3) $679,780 ($731,500 - $51,720), as of the October 1, 2010.

The expert next determined the capitalization rates to be applied to the subject property's Net Operating Income employing the band of investment technique, consulting with investor surveys for "additional corroborative support."[12] Ultimately, the expert concluded the following

---

[11] The expert employed a gross improvement size of 100,960 square feet for the subject property based on "aerial drawings" (100,960 x $0.15 per square foot = $15,144). However, the court's gross building area calculation reveals an aggregate square footage for all buildings on the subject property of 105,760 square feet (72,100 + 5,400 + 11,600 + 8,160 + 8,500 = 105,760).

[12] The expert offered testimony that he examined PWC Korpacz Real Estate Investor Surveys of the National Warehouse Market for the 3rd Quarter 2008, 3rd Quarter 2009, and 3rd Quarter 2010

overall capitalization rates for the subject property: (1) 8.27%, as of the October 1, 2008 valuation date; (2) 8.39%, as of the October 1, 2009 valuation date; and (3) 8.39%, as of the October 1, 2010 valuation date.

After applying his selected capitalization rates to the computed Net Operating Income, the expert concluded a true or market value for the subject property under the Income Capitalization Approach as follows: (1) $9,420,000, as of the October 1, 2008 valuation date ($779,056/.0827 = $9,420,266); (2) $8,695,000, as of the October 1, 2009 valuation date ($729,462/.0839 = $8,694,422); and (3) $8,100,000, as of the October 1, 2010 valuation date ($679,780/.0839 = $8,102,265).

### 3. Conclusion

The court's analysis of the expert's income capitalization approach begins with a restatement of the expert's description of the subject property as a 20 acre tract of land utilized as a 110 door truck terminal, containing an office area of 5,400 square feet, a transit warehouse of 72,100 square feet, two modular office structures of 8,500 square feet, a truck repair building of 8,160 square feet, a truck cab repair building of 11,600 square feet, a guard house, and a parking and staging area. Central to the expert's understanding of the use and operation of a truck terminal/transmit warehouse, and thus to its value, was that "transit warehouse[s] include[] land for storage, staging of trucks, as well as those parked [trucks]. Includes parking lots, and the truck terminals."

However, in attempting to reconcile the similarities and differences existing between the subject property and comparable leases 1, 2, and 3, it became evident that, in the court's opinion,

---

to develop his equity dividend rate. Significantly however, the expert's appraisal report omits any objective market support for the mortgage component of his band of investment capitalization rate.

the expert did not possess sufficient detailed information about the lease terms of the properties he identified in order to effectively and properly gauge their comparability and competitiveness to the subject property. Although the expert emphasized that, in his opinion, the unit of comparison for truck terminals/transit warehouses is principally the number of dock doors, the expert's unfamiliarity with basic lease terms, including possessory rights, leased area, and use, rendered the expert's identification of proposed comparable leases suspect. Critical to the income capitalization approach is discerning a property's market rent, the "most probable rent that a property should bring in a <u>competitive and open market reflecting all conditions and restrictions of the lease agreement</u>. . ." <u>The Dictionary of Real Estate Appraisal</u>, at 121-122 (emphasis added). As a result of the expert's lack of knowledge regarding basic information about the comparable leased properties, and lease terms and provisions, the court is not satisfied that the comparable leases accurately reflect market rent.

    a. <u>Lease 1</u>

The expert was unable to conclusively state whether he reviewed comparable lease 1 or was provided with a rent roll containing lease terms. According to the expert, "I had answers to interrogatories, and . . . have no recollection whether I had the rent roll or the lease." Significantly, although the expert expressed that his appraisal report is "100 percent accurate, 100 percent verified," when specific inquiry was made regarding who the lease terms were verified with, the expert could not recall, nor could he remember the names of the brokers involved in the lease transaction.[13] Additionally, the expert could not recollect whether comparable lease 1 contained a fixed annual rent or an escalating annual rent during the lease term.

---

[13] The expert asserted that this information was contained in his work file, which the expert did not produce during two days of testimony.

Although the property on which comparable lease 1 is located seemingly includes approximately six large multi-tenanted buildings, the expert: (i) did not know the property's land size; (ii) did not know the square footage of all buildings on the site; (iii) did not know whether other tenants occupied any other potion of the buildings; and (iv) did not know what square footage of the building was dedicated to the subject lease. Nonetheless, the expert expressed his belief that the lease included only thirty-three dock doors, and that the square footage of the building was "irrelevant" as the unit of value is solely the annual rent, per dock door. However, the expert did not know if comparable lease 1 afforded the tenant the right to use the entire site, to use only the portion of the paved areas in front of the thirty-three dock doors, or to use the adjacent paved areas for staging and storage of trailers. Instead, the expert "presume[d] they [the tenant] had the entire site from which to use," without examining the lease or making any inquiry of the transaction participants.

b. Lease 2

The expert was similarly unable to conclusively state whether he reviewed comparable lease 2 or was provided with a rent roll containing lease terms. According to the expert, he knows this lease exists because he previously inspected the property in connection with an unrelated matter and "saw documents with respect to this lease." Moreover, although the expert testified that the lease was for the entire property (including several adjacent lots and buildings)[14], the expert: (i) did not know the property's total land size; (ii) did not know the square footage of all buildings on the site; (iii) did not know the ceiling height of the buildings; and (iv) did not know what square footage of the building was dedicated to the truck terminal lease. In the expert's

---

[14] During trial the expert highlighted the perimeter of what he believed was the leased area. The leased area highlighted by the expert contains three or four separate parcels of real property, containing a total of three separate buildings.

opinion, land size is "not a prime indicator [of value] for truck terminals," and therefore, he did not factor in land size in identifying comparable properties. However, a fundamental tenet of the income capitalization approach involves the identification of leased properties that are competitive and comparable to the subject property in order to derive an accurate market or economic rent.

Here, the expert was unable to conclusively state whether the subject lease afforded the tenant the right to use and occupy only the dock height doors, or whether the tenant had any right to use the adjacent buildings, or paved parking area for staging and/or trailer storage. Moreover, although the expert initially offered testimony that the subject lease included the entire property, the expert was unsure whether the tenant leased the truck repair facility on the subject property. Nonetheless, it was the expert's "interpretation" that the truck repair facility "would be available" to the tenant, however the record contains no evidence to support this "interpretation." Thus, the expert possessed little information about the use, rights, and interests which the subject lease afforded the tenant.

c. Lease 3

The expert was similarly unable to conclusively state whether he reviewed lease 3 or was merely afforded a rent roll. Moreover, the expert did not know if lease 3 was an initial or renewal lease. Similarly, the expert could not recall whether the rent was fixed or escalated over the lease term. According to the expert the building is a "big [multi-tenanted] facility," and the subject lease included only fifty-eight dock doors at the facility. However, the expert did not know the parcel land size, the overall building size, or how many square feet within the building was being leased to the tenant. Moreover, the expert did not know if the building contained an office area, or if any part of the building was being utilized for warehouse purposes. According to the expert, the landlord was leasing only fifty-eight dock doors to the tenant, however the expert did not know if

the tenant had any office area, or any right to store trailers on the property, or to use any part of the property for staging. The expert further acknowledged that the leased property did not contain any ancillary buildings for use as truck repair or truck cab repair facilities.

In sum, the expert's unfamiliarity with the three comparable leases raises material doubts for the court regarding the accuracy and reliability of the lease data, including the expert's credibility in selecting these comparable leases. As stated above, the utility of a truck terminal/transit warehouse is influenced by notable several factors, including, but not limited to, location, the number of dock doors, site size, staging and parking areas, repair garages, and security. Appraising Industrial Properties, at 329. Thus, without a clear understanding of the property and property rights conveyed under the three leases the court cannot conclude that the values reported by the expert accurately represent the economic or market rent of a truck terminal/transit warehouse comparable to the subject property.

For the foregoing reasons, the court is unable to accord the expert's income capitalization approach any weight.

3. Reconciliation

Having reached conclusions of the true market value of the subject property under the sales comparison approach, the court will determine the correct assessments for the 2009, 2010, and 2011 tax years.

Under N.J.S.A. 54:51A-6(a), commonly referred to as Chapter 123, when the court is satisfied in a non-revaluation year by the evidence presented "that the ratio of the assessed valuation of the subject property to its true value exceeds the upper limit or falls below the lower limit of the common level range, it shall enter judgment revising the taxable value of the property by applying the average ratio to the true value of the property. . . ." N.J.S.A. 54:51A-6(a). This

30

process involves application of the Chapter 123 common level range. N.J.S.A. 54:1-35a(b). When the ratio of assessed value exceeds the upper limit or falls below the lower limit, the formula for determining the revised taxable value of property, under N.J.S.A. 54:51A-6(a), is as follows:

True market value    x    Average ratio  =    Revised taxable value

For the 2009 tax year, application of the Chapter 123 ratio results in an applied lower limit of .0826 and an upper limit of .1118. The ratio of total assessed value, $2,000,000, to true market value, $17,405,630, yields a ratio of .1149%, which exceeds the applied upper limit. Consequently, the calculation for the 2009 tax year is:

$17,405,630    x    .0972    =    $1,691,800 [ROUNDED]

Accordingly, a judgment establishing the local property tax assessment for the subject property for the 2009 tax year will be entered as follows:

| | |
|---|---|
| Land | $1,495,100 |
| Improvement | $   196,700 |
| Total | $1,691,800 |

For the 2010 tax year, application of the Chapter 123 ratio results in an applied lower limit of .0903 and an upper limit of .1221. The ratio of total assessed value, $2,000,000, to true market value, $16,550,270, yields a ratio of .1208%, which falls between the upper limit and lower limit of the range. Consequently, no reduction in the subject property's 2010 tax year assessment is warranted.

For the 2011 tax year, application of the Chapter 123 ratio results in an applied lower limit of .1003 and an upper limit of .1357. The ratio of total assessed value, $2,000,000, to true market value, $15,694,800, yields a ratio of .1254%, which falls between the lower limit and upper limit of the range. Consequently, no reduction in the subject property's 2011 tax year assessment is warranted.

Accordingly, the court will enter judgments reflecting the foregoing

Very truly yours,


Hon. Joshua D. Novin, J.T.C.