TAX COURT OF NEW JERSEY

**CHRISTINE M. NUGENT**
JUDGE



153 Halsey Street
Gibraltar Building - 8TH Floor
Newark, New Jersey 07101
(609) 815 – 2922 Fax: (973) 648-2149

July 8, 2019

Michael W. C. Fourte, Esq.
335 Orange Road
Montclair, NJ 07042

Joseph V. Sordillo, Esq.
McElroy, Deutsch, Mulvaney & Carpenter, LLP
1300 Mount Kemble Ave.
PO Box 2075
Morristown, NJ 07692

Re:    **Kihara R. Kiarie, Revoc. Trust v. Township of Montclair**
           **Docket No. 009646-2017**

Dear Counsel:

This letter constitutes the court's opinion after trial challenging Taxpayer's 2017 property tax assessment. For the reasons explained more fully below, the Clerk of the Tax Court is directed to enter judgment reducing the assessment.

## FACTS

Kihara R. Kiarie, Revocable Trust is the owner of a single-family colonial style house in the Township of Montclair ("Township"). The property is designated on the Township tax map as Block 406, Lot 25, commonly known as 45 Highland Avenue ("Subject Property" or "Subject"). An appeal to the County Board of Taxation ("County Board") challenging the 2017 tax assessment was filed, and on June 1, 2017, the County Board affirmed the assessment. The judgment was appealed to the Tax Court in a timely manner. For tax year 2017 the Subject Property was assessed as follows:

| | | |
|---|---|---|
| Land | $ | 352,300.00 |
| Improvements | $ | 960,500.00 |
| Total | $ | 1,312,800.00 |

*

The Chapter 123 ratio for Montclair for tax year 2017 was 80.75%, with an upper limit of 92.86%, and a lower level of 68.63%.

Three witnesses appeared at trial. Township called Mark Hendricks, a New Jersey State Certified General Real Estate Appraiser, as an expert witness who prepared a report opining to the value of the Subject. Kihara Kiarie ("Taxpayer") testified on his own behalf, and Taxpayer also called as a witness, George Librizzi, the Township tax assessor. Taxpayer produced: (1) a map showing the location of the Subject Property and the relative locations of the comparable properties utilized by him and by Township's expert; (2) a chart listing the Subject Property's equalized values for 2015, 2016, and 2018, as well as Township's expert's value for 2017. Township produced: (1) the HUD-1 settlement statement from Taxpayer's 2014 purchase of the Subject Property; and (2) the expert appraisal report. Taxpayer stipulated to the expert's qualifications and all of the evidence was admitted into evidence without objection.[1]

The court found Taxpayer to be a credible witness. He was direct and believable in his responses and did not embellish the answers. Township's expert and the assessor were likewise credible witnesses who were professional in their manner of testifying and showed no special interest in the outcome of the case that would adversely affect their credibility. The court finds the following facts from testimony of the witnesses and the evidence accepted into the record.

---

[1] Taxpayer sought to qualify as an expert witness a licensed real estate appraiser who prepared a report of the Subject Property value. Township objected, arguing the Subject was assessed at $1.32 million, but the license carried a limitation on the ability to value property over $1 million. N.J.A.C. 13:40A-1.3. The regulation defines the scope of practice qualification of a licensed real estate appraiser as the appraisal of "non-complex one to four residential units having a transaction value less than $1,000,000 and complex one to four residential units having a transaction value less than $250,000." The court ruled that the regulation would not prevent the witness from testifying as an expert if the witness was otherwise qualified. Despite the court's ruling, the witness elected not to testify and Taxpayer chose to proceed without him.

The Subject Property is located in a desirable residential neighborhood, where the typical residence is in excess of 4,000 square feet with values ranging from $900,000 to $2,500,000. The Subject Property contains a two and one-half story house approximately 5,151 square feet in size, with a finished basement, and fourteen rooms, including four bedrooms, three full baths, and one half bath, two fireplaces and a four-car, built-in garage. Built in 1995 with an addition constructed in 2000, it provides a "seasonal view" of the New York City skyline. The Subject Property measures .55 acres, and is located in the R-O zone (Mountainside zone) which has a minimum lot area of 20,000 square feet. A combination of hardwood, ceramic tile, and wall-to-wall carpet floor coverings appear throughout the house. The kitchen features marble countertops, ceramic tile floors and backsplash, and stainless steel appliances. The bathrooms feature ceramic tile floors, and a stand-alone Jacuzzi-style bathtub in the master bath. A four-zone gas fired heating system serves the majority of the property. Due to the topography, a sewer ejection pump system was installed in the basement utility closet. The pump system requires replacement every 3-5 years at a cost of $5,000. The property contains an elevated wood deck and covered paver block patio in rear of the property.

Taxpayer purchased the Subject Property in June 2014 for $1,350,000, after placing unsuccessful bids on several other properties. After buying the property, Taxpayer renovated the basement and some of the outside area. The interior renovations began in December 2015, and were completed in April 2017, and cost approximately $125,000. In the basement, Taxpayer removed and replaced the existing kitchen and bathroom, and added a media room/home theater, a recreation room with wet-bar, and a wine cellar. The finished basement features tile floors, a wine cellar with built-in cabinets and glass doors, two refrigerators, and a bathroom with custom ceramic tile floors and walls, and a gas fired HVAC unit. As described by Taxpayer, before the

renovation the basement was "not appealing." The renovation "changed the feel of the house." As of October 1, 2016, the renovation was still in progress. Taxpayer was not yet using the basement, however the plumbing and the heating ducts were in place, and the remainder was largely complete. The basement lights worked but the contractor and subcontractor needed to return to complete some work on the floors and appliances. Subsequent to the October 1, 2016, valuation date, Taxpayer added stairs down to the backyard and a retaining wall as part of the renovation, for a total renovation cost of $150,000.

At the time of purchase, the sellers presented the square footage of the home as 5,992 square feet, as reflected by the measurement in the Township's records. After Taxpayer challenged the assessment to the County Board, the assessor re-measured the home. The assessor found the foyer area contained a cathedral ceiling rather than two-stories, which resulted in a miscalculation of the square footage in the Township records. The assessor corrected the description in the Computer Assisted Mass Appraisal program, which reclassified the area as cathedral ceiling over one story. As a result, the Township records were changed to reduce the square footage from 5,992 to 5,150, or a change of 842 square feet in total. In Taxpayer's view, the $1,350,000 sales price he paid for the property was based in part on the representation that the home was substantially larger than the actual size. On that basis, Taxpayer argued that he overpaid for the house, and that it was over-assessed since the assessment was based on a home nearly 900 square feet larger than the actual size.

Taxpayer elicited testimony from the assessor regarding the issue of the square footage error, and the effect the error would have on the value of the Subject. According to Taxpayer, his property before renovations was overvalued by $189,000, meaning he paid more than $30,000 in excess taxes. In reaching that conclusion, he first calculated the purchase price per square foot (as

revised) or $1,350,000/5,150 = $225, then multiplied the $225/sq ft. by the error in square footage, or, 842 x $225= $189,000. The assessor acknowledged that based on the reduced square footage, the Subject would be worth less than the value at 5,992 square feet, but did not agree that Taxpayer's method fairly reflected the difference in value. The assessor testified that he would rely on the opinion of value derived by Township's expert.

Aside from testimony regarding the Subject sale, Taxpayer testified to four comparable sales located in Montclair. He derived the square footage information from Zillow, the Multiple Listing Service ("MLS"), and Township records. Taxpayer demonstrated the geographic distance between the comparable properties and the Subject using a map of Montclair with markers to indicate the property locations. He made no adjustment to the sales prices for differences between the comparable sales and the Subject.

Sale 1 is located at 344 Highland Avenue, approximately 1.4 miles from the Subject Property. The house contains 4,343 square feet and it was sold on August 19, 2016 for $1,250,000. Township relied on this sale as well, but adjusted for differences.

Sale 2 is located at 154 Upper Mountain Avenue, approximately 0.5 miles from the Subject. The house is 6,222 square feet, with 14 rooms, 6 bedrooms, 3 full baths and one half bath, and 6 fireplaces. It sold on August 31, 2016 for $1,289,000. Taxpayer was previously inside the home during an open house. Cross-examination revealed that the property record card prepared for this property reflected 15 rooms and 5,733 square feet.

Sale 3 is located at 10 Christopher Court, approximately 1.3 miles from the Subject. It was sold on December 17, 2015 for $1,075,000. The house is 5,072 square feet. Taxpayer viewed the interior of the home at an open house.

Sale 4 is located at 154 Union Street, approximately 1.1 miles from the Subject. The house is 5,640 square feet and sold on June 15, 2016 for $1,250,000.

At the conclusion of his testimony, Taxpayer acknowledged that the Subject Property could now be more worth than the purchase price, given completion of the renovations. However, he felt as of October 1, 2016, the renovations added little value over the purchase price he paid. According to Taxpayer, "when I bought it for $1,350,000 that's what it's valued at."

Township's expert inspected the Subject Property in February 2018. Per his cross-examination testimony, he assumed the house looked the same on October 1, 2016, as it did at the inspection. He found the house to be well-maintained and in good overall condition. In reliance on information obtained from the MLS and tax records, he produced four comparable sales of properties located in Montclair used to establish the value of the Subject. The expert adjusted the sales for the differences between the Subject and the sale properties in bath count, square footage (dwelling size), and amenities (including fireplace, deck, patio, modern kitchen/baths, and basement pump system.) The expert prepared a paired sales analysis to arrive at the adjustment of $235.00 per square foot for the difference in dwelling size between the Subject and the comparable sales. "Paired data analysis is based on the premise that when two properties are in all other respects equivalent, a single difference can be measured to indicate the difference in price between them." Appraisal Institute, The Appraisal of Real Estate, 438 (12th 2001). No adjustment was made for time/market conditions where each sale took place in the two months preceding the valuation date, and no adjustment was applied for location. The court accepts all of the adjustments, finding the size adjustment to be market based and the remaining adjustments to be reasonable. The expert testified generally to the distance from Subject to comparable property and disagreed with Taxpayer's testimony in that regard. Taxpayer produced a map of the comparable

sales relied on by both parties, including the distance from Subject to each comparable sale. The court finds the Taxpayer's testimony was credible and accepts the distances provided. The expert provided the following evidence of comparable sales, but the distances were adopted by the court from Taxpayer's evidence:

Sale 1 is located at 15 Highland Avenue, 0.3 miles from the Subject in the R-1 zone, comprised of .298 acres.[2] The property sold on August 19, 2016 for $1,425,000, after 14 days on the market, and it provides a seasonal view of the New York City skyline. Built in 1912, the house was gut renovated in 2015 and contains 4,142 square feet of dwelling space. The expert made the following adjustments: $237,100 upward size adjustment for 1,009 difference in square footage; $40,000 upward adjustment for lack of garage where the subject has 4-car garage; downward adjustment of $30,000 for additional bathroom; $5,000 downward adjustment for sewer injection system. As adjusted the expert opined a value of $1,667,100.

Sale 2 is located at 344 Highland Avenue, 1.4 miles from the Subject in the R-1 zone. It sold on August 19, 2016 for $1,250,000, after 29 days on the market. It provides a seasonal view of the New York City skyline. Built in 1927, the house was renovated over the years, with no proof of dates or extent of renovations, and contains 4.343 square feet of dwelling space. Both parties relied on the sale. The expert made the following adjustments: upward $189,000 size adjustment for 808 difference in square footage; upward $20,000 adjustment for 2-car garage; downward $20,000 adjustment for tennis court; downward $5,000 adjustment for absence of sewer injection system. As adjusted the expert opined a value of $1,434,900.

---

[2]    The R-1 zone (one-family zone) has no minimum lot area, unlike the minimum lot area of 20,000 square feet requirement in the R-O zone. The permitted principal, conditional, and accessory uses are the same in the R-1 zone and R-O zone.

Sale 3 is located at 110 Clinton Avenue, 1.5 miles from the Subject Property, in the R-O zone. Like the Subject, it provides a seasonal view of New York City and contains 4,779 square feet of dwelling space. It was constructed in 1996 and sold on August 2, 2016 for $1,375,000, after 77 days on the market. The expert made the following adjustments: upward $87,400 size adjustment for 372 difference in square footage; upward $20,000 adjustment for 2-car garage; downward $30,000 adjustment for extra bathroom; $5,000 downward adjustment for absence of injection system. As adjusted the expert opined a value of $1,427,400.

Sale 4 is located at 105 Stonebridge Road, 1.9 miles from the Subject, in the R-O zone, comprised of .812 acres. It sold for $1,900,000 on September 30, 2016 after 99 days on the market. It contains 4,532 square feet of dwelling space. The house was gut renovated in 2015, just before the sale. The expert applied the following adjustments: $145,500 upward size adjustment for 600 difference in square footage; $20,000 upward adjustment for 2-car garage, $30,000 downward adjustment for bathrooms; downward $5,000 adjustment for lack of injection system. As adjusted the expert opined a value of $2,030,500. The property does not have a view, but no adjustment was made to reflect the difference from the Subject. Effective cross-examination revealed that the sale was marked NU-7, "assessment prior to significant change."

The expert did not rely on the Subject sale because, in his opinion, it was "the absolute definition of a short sale" and dismissed it. He arrived at that conclusion based on information in the HUD-1 statement, which revealed that in addition to the $1,350,000 purchase price paid by buyer, the seller paid $401,409 at the closing. On cross-examination, the expert acknowledged that this was merely his opinion and was not supported by any additional evidence. For instance, the property record card apparently had no non-usable marking, and the expert never spoke to the seller. Taxpayer testified that the seller had overpaid for the home, having purchased it at the top

of the market, which resulted in the seller's large adjustment at closing. He further testified that the sellers made several attempts to sell the property at higher prices, and then kept lowering the value in an attempt to "get it off their books." Township's expert opined a value of $1,640,000 for the Subject Property as of October 1, 2016.

ANALYSIS

The court's analysis begins with the well-established principle that "[o]riginal assessments and judgments of county boards of taxation are entitled to a presumption of validity." MSGW Real Estate Fund, LLC v. Borough of Mountain Lakes, 18 N.J. Tax 364, 373 (Tax 1998). "The strength of the presumption is exemplified by the nature of the evidence that is required to overcome it. That evidence must be 'definite, positive and certain in quality and quantity to overcome the presumption.'" Ibid. (quoting Pantasote Co. v. City of Passaic, 100 N.J. 408, 413 (1985) (citations omitted)). The presumption of correctness arises from the view "that in tax matters it is to be presumed that governmental authority has been exercised correctly and in accordance with the law." Pantasote, 100 N.J. at 413 (citing Powder Mill, I Assocs. v. Twp. of Hamilton, 3 N.J. Tax 439 (Tax 1981)); see also Byram Twp. v. Western World, Inc., 111 N.J. 222 (1988). The presumption remains "in place even if the municipality utilized a flawed valuation methodology, so long as the quantum of the assessment is not so far removed from the true value of the property or the method of assessment itself is so patently defective as to justify removal of the presumption." Transcon. Gas Pipe Line Corp. v. Bernards Twp., 111 N.J. 507, 517 (1988) (citations omitted).

"In the absence of a R. 4:37-2(b) motion . . . the presumption of validity remains in the case through the close of all proofs." MSGW Real Estate Fund, 18 N.J. Tax at 377. In making the determination whether the presumption has been overcome, the court should weigh and analyze

9

the evidence "as if a motion for judgment at the close of all the evidence has been made pursuant to R. 4:40-1 (whether or not the defendant or plaintiff actually so moves), employing the evidentiary standard applicable to such a motion." Ibid. The court must accept as true the proofs of the party challenging the assessment and accord that party all legitimate favorable inferences from that evidence. Id. at 378. (citing Dolson v. Anastasia, 55 N.J. 2, 5 (1969)). In order to overcome the presumption, the evidence "must be sufficient to determine the value of the property under appeal, thereby establishing the existence of a debatable question as to the correctness of the assessment." W. Colonial Enters. v. City of East Orange, 20 N.J. Tax 576, 579 (Tax 2003) (quoting Lenal Props., Inc. v. City of Jersey City, 18 N.J. Tax 405, 408 (Tax 1999), aff'd, 18 N.J. Tax 658 (App. Div. 2000)). Only after the presumption is overcome with sufficient evidence at the close of trial must the court "appraise the testimony, make a determination of true value and fix the assessment." Rodwood Gardens, Inc. v. City of Summit, 188 N.J. Super. 34, 38-39 (App. Div. 1982) (citations omitted). If the court determines that sufficient evidence to overcome the presumption has not been produced, the assessment shall be affirmed and the court need not proceed to making an independent determination of value. See Ford Motor Co. v. Twp. of Edison, 127 N.J. 290, 312 (1992); Global Terminal & Container Serv. v. City of Jersey City, 15 N.J. Tax 698, 703-04 (App. Div. 1996).

After the conclusion of Taxpayer's case, Township made a motion to dismiss arguing Taxpayer did not refute the assessment since no opinion of value was provided. The court denied the motion based largely on Taxpayer's testimony that he equated the June 2014 Subject sale price with its value as of the valuation date. Glen Wall Assocs. v. Township of Wall, 99 N.J. 265 (1985) ("[A] bona fide sale of property may be indicative of the true value of the property.") In addition to the Subject sale, Taxpayer also produced evidence of properties sold around the

valuation date presented as comparable to the Subject Property, with unadjusted sales prices ranging from $1,250,000 to $1,289,000. Notably, the 2017 assessment on the property reflects an equalized value of $1,625,758 ($1,312,800/.8075 = $1,625,758). Having accorded all favorable inferences to Taxpayer's evidence the court found Taxpayer raised a debatable question about the correctness of the assessment.

The court will next "weigh and evaluate all the evidence and determine whether either party has established, by a preponderance of the evidence that the true value of the subject property as of the applicable assessment dates was such as to warrant adjustments in the assessments." MSGW Real Estate Fund, 18 N.J. Tax at 380. The sales comparison approach is the appropriate method of estimating value for a residence. Brown v. Borough of Glen Rock, 19 N.J. Tax 366, 377 (App. Div. 2001). The value is derived by comparing similar properties that have recently sold, identifying appropriate units of comparison, and making adjustments to the sales prices of the comparable properties based on relevant, market-derived elements of comparison. Appraisal Institute, The Appraisal of Real Estate, 301-02 (13th ed. 2008). The court finds that this approach is the best method for determining the true market value of the Subject Property.

It is indisputable that to perform a proper sales comparison approach, there must be substantial similarity between the subject property and the comparable property. Venino v. Borough of Carlstadt, 1 N.J. Tax 172, 175 (Tax 1980), aff'd, 4 N.J. Tax 258 (App. Div. 1981). Where adjustments are made they must be based on established appraisal principles. New Jersey Division of Taxation, Real Property Appraisal Manual for New Jersey Assessors, I-115 (3rd Ed. 2002) ("In order to properly compare the subject property with the similar properties which have sold, it is necessary to establish uniform standards for measurement of the differences.") See also Congoleum Corp. v. Hamilton Twp., 7 N.J. Tax 436, 451 (Tax 1985) (Adjustments must be

11

adequately supported with objective data); <u>Greenblatt v. Englewood City</u>, 26 N.J. Tax 41, 55 (Tax 2010) ("adjustments must have a foundation obtained from the market" with an "explanation of the methodology and assumptions used in arriving at the [ ] adjustments [ ]" otherwise they are entitled to little weight.)

It is Taxpayer's position that even if the renovated improvements would have had some effect on the 2017 value, the equalized assessed value of $1,625,000 greatly exceeded the property value as of the valuation date given that he paid $1,350,000 two years prior. As noted, Taxpayer also produced four unadjusted comparable sales, but testimony about the property specifics was lacking. Taxpayer testified to the comparable properties sale date and price, square footage, and location, only. Taxpayer provided some additional detail such as the room count and number of bedrooms for Sale 2. As to the remaining sales, those details were lacking. Likewise, there was no testimony regarding the condition of the homes, age, the amenities or the circumstances of the sales transactions to demonstrate that these properties were similar to the Subject and thus that no adjustments were needed. The degree of comparability, and the resultant need to adjust the sales prices based on characteristics dissimilar to the Subject, is absent from the record. Accordingly, the comparable sales presented by Taxpayer will not be afforded weight by the court in arriving at value.

With regard to the progress of the renovations and the effect they would have on value as of the valuation date, the court finds that Taxpayer's testimony about the condition of the improvement varies only slightly from the expert's understanding of the Subject's condition on that date. While the basement was not yet in use, as described by Taxpayer, the interior renovation was largely complete, with items in the nature of a punch-list remaining. Exterior renovations were undertaken sometime after the valuation date.

In arriving at the Subject value, using the as-adjusted sales prices of the comparable sales he relied on, the expert eliminated the extremes and reduced the range to $1,434,900 to $1,667,100. He then calculated the average of all sales, concluding a value of $1,640,000 for the Subject ($1,639,975 rounded.) The expert excluded the Subject sale as non-usable. The court finds insufficient proof in the record to exclude the Subject sale from consideration as a non-usable, short sale. Notwithstanding that, the Subject sale is rather remote from the valuation date. In addition, the sales price appears to have been based on the larger square footage mistakenly represented, and, between the valuation date and the time of purchase, Taxpayer made improvements to the property as described by him. On that basis, the court will not accord weight to the Subject sale price.

A review of the expert's comparable sales, reveals that comparable sale 4 is an outlier. The property is not truly comparable, as the adjusted price far exceeds that of the Subject and the other three comparable sales. Taxpayer testified that this property is in a different area of town, in what he termed "an aspirational neighborhood" for him, located 1.9 miles away from the Subject. The court disregards comparable 4 from its consideration of value.

Sale 1, 15 Highland, while only six houses away from the Subject, was gut renovated in 2015, and the lot size is half the size of the Subject. With a comparable adjusted sales price of $1,667,100, it too appears to be an outlier and the court does not consider the sale to be credible proof of the Subject's value. The court finds that Sales 2 and 3 provide reliable evidence of value. Sale 2, 344 Highland, located in the R-1 zone, has an adjusted sales price of $1,434,900. Sale 3, 110 Clinton, built in 1996, so one year newer than the Subject, is located in the R-O zone like the Subject. The adjusted sales price is $1,427,400. The court affords the greatest weight to Sale 3 and finds the true value of the subject on October 1, 2016 to be $1,400,000.

Having determined the true value of the Subject, the court must next find the correct assessment. Under N.J.S.A. 54:51A-6, or Chapter 123, as it is commonly known, when the court is satisfied in a non-revaluation year that "the ratio of the assessed valuation of the subject property to its true value exceeds the upper limit or falls below the lower limit of the common level range, it shall enter judgment revising the taxable value of the property by applying the average ratio to the true value of the property . . . . N.J.S.A. 54:51A-6(a). This process involves application of the Chapter 123 common level range. N.J.S.A. 54:1-35a(b). The 2017 tax year Chapter 123 average ratio for Montclair Township is 80.75%, and the corresponding Chapter 123 common level range has a lower limit of 68.63% and an upper limit of 92.86%. The ratio of assessment to true value ($1,312,800/$1,400,000) yields a ratio of 93.77% which exceeds the upper limit of the Chapter 123 common level range. Consequently, the formula for determining the correct taxable value of the Subject for the 2017 tax year is $1,400,000 x .8075 = $$1,130,500.

The clerk of the court is directed to enter judgment revising the 2017 assessment as follows:

| | |
|---|---|
| Land- | $352,300 |
| Improvement- | $778,200 |
| Total- | $1,130,500 |

Very truly yours,

Christine Nugent, J.T.C.

14